47 F.3d 1370
 31 Fed.R.Serv.3d 451
 James E. SIMMONS, Individually and on behalf of all those he
represents, Plaintiff-Appellant,
v.
Vernon POE, Individually and in his official capacity as a
deputy sheriff; L.E. McCann, Individually and in his
official capacity as a Special Agent with the Virginia State
Police; Carl R. Baker, Superintendent of the Virginia State
Police, in his official capacity; M. Wayne Huggins, in his
official capacity as Superintendent of the Virginia State
Police, Defendants-Appellees,
and
Virginia State Police; Julian E. Boyer, Individually and in
his official capacity as a Magistrate in Powhatan
County, Virginia, Defendants.
James E. SIMMONS, Individually and on behalf of all those he
represents, Plaintiff-Appellee,
v.
Vernon POE, Individually and in his official capacity as a
deputy sheriff, Defendant-Appellant,
and
L.E. McCann, Individually and in his official capacity as a
Special Agent with the Virginia State Police; Virginia
State Police; Carl R. Baker, Superintendent of the Virginia
State Police, in his official capacity; Julian E. Boyer,
Individually and in his official capacity as a Magistrate in
Powhatan County, Virginia, Defendants.
James E. SIMMONS, Individually and on behalf of all those he
represents, Plaintiff-Appellee,
v.
L.E. McCANN, Individually and in his official capacity as a
Special Agent with the Virginia State Police,
Defendant-Appellant,
and
Virginia State Police; Carl R. Baker, Superintendent of the
Virginia State Police, in his official capacity; Vernon E.
Poe, Individually and in his official capacity as a deputy
sheriff; Julian E. Boyer, Individually and in his official
capacity as a Magistrate in Powhatan County, Virginia, Defendants.
 Nos. 94-1583, 94-1584 and 94-1648.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1994.
Decided March 1, 1995.
 
 ARGUED: Gerald Thomas Zerkin, Gerald T. Zerkin & Associates, Richmond, VA, for appellant. Barbara J. Gaden, Asst. Atty. Gen., Richmond, VA, Fred R. Kozak, Maloney, Yeatts & Barr, P.C., Richmond, VA, for appellees. ON BRIEF: Robert Godfrey, Liesl D. Wilke, Melanie A. Hopper, Gerald T. Zerkin & Associates, Richmond, VA, David P. Baugh, Richmond, VA, for appellant. James S. Gilmore, III, Atty. Gen., Gregory E. Lucyk, Sr. Asst. Atty. Gen., Lee Melchor, Asst. Atty. Gen., Richmond, VA, Archer L. Yeatts, III, Maloney, Yeatts & Barr, P.C., Richmond, VA, for appellees.
 Before HALL and MURNAGHAN, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 Affirmed in part and reversed in part by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge HALL and Senior Judge LAY joined.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 The instant appeal arises from an action by Appellant, James E. Simmons, an African-American resident of Powhatan County, Virginia, in which he alleged several violations of his rights under the Fourth, Thirteenth, and Fourteenth Amendments to the Constitution by the following persons: Vernon E. Poe ("Poe"), a Powhatan County deputy sheriff; Wayne Huggins ("Huggins"), the Superintendent of the Virginia State Police; L.E. McCann ("McCann"), a State Police special agent; and Julian Boyer ("Boyer"), a Magistrate Judge in Powhatan County, Virginia*. The alleged violations occurred in connection with Simmons's seizure pursuant to a search warrant as part of a police investigation of the rape of an elderly white woman in Powhatan County. As part of that seizure, blood was taken from Simmons for the purpose of DNA testing, ultimately proving that Simmons was not the rapist.
 
 
 2
 On October 21, 1993, Simmons filed an amended complaint in the United States District Court for the Eastern District of Virginia alleging: (1) that the Appellees violated 42 U.S.C. Sec. 1985(3) by conspiring to cause his seizure and the removal of his blood pursuant to an illegal search warrant, in derogation of his rights under the Fourth, Thirteenth and Fourteenth Amendments; (2) that the Appellees violated 42 U.S.C. Secs. 1983 and 1985(3) by using and conspiring to use a racist behavioral profile to effect the investigation, search and seizure, and arrest of African-American males; and (3) that Appellees Poe and McCann violated 42 U.S.C. Sec. 1983 by deliberately omitting material exculpatory information from the search warrant application and affidavit. By an order dated February 3, 1994, the District Court denied Simmons's motion for partial summary judgment, and granted the Appellees' motions for summary judgment as to the claims against the Superintendent and as to the section 1985(3) conspiracy claim. Additionally, the District Court granted Magistrate Boyer's motion to dismiss, denied Simmons's request for class certification, and denied Poe's and McCann's claims of entitlement to qualified immunity.
 
 
 3
 On March 2, 1994, Simmons filed a renewed motion for partial summary judgment as to the section 1983 claims. Before that motion was denied, however, Poe and McCann filed notices of appeal from the District Court's denial of their claims of entitlement to protection under the doctrine of qualified immunity. Simmons subsequently filed a motion to certify the appeal as frivolous, upon which Poe and McCann voluntarily withdrew their appeal, preserving their right to appeal the qualified immunity issue at a later time. The District Court then entered its final order, dated April 11, 1994, granting to Appellees summary judgment as to the remaining claims.
 
 
 4
 Simmons filed a timely notice of appeal on May 29, 1994. Appellees Poe and McCann also timely noted their cross-appeals on the issue of qualified immunity.
 
 Factual Background
 
 5
 On January 25, 1992, at approximately 1:00 a.m., an elderly white woman was raped in her home in Powhatan County, Virginia. The crime was investigated by members of the Powhatan County Sheriff's Office, led by Appellee, Deputy Sheriff Vernon E. Poe. The victim provided the following physical description of her attacker to investigators: the attacker was male, medium height and build (5'8" to 5'10"), with a "mild" voice and a "northern" accent, and wearing a ski mask, leather gloves, and dark clothing.
 
 
 6
 During the initial investigation of the rape, the investigators determined that the attacker had entered the victim's home through a window in the kitchen. Police dogs led the deputies to the nearby home of a white male, Eric Land. Appellee Poe considered both Eric Land and his brother, Mark, to be possible suspects, but initially dismissed Mark as "much too tall" to be a potential suspect. Eric was also initially dropped from consideration because his mother and brother provided him with an alibi.
 
 
 7
 On January 27, 1992, Deputy Sheriff Poe consulted with Appellee, Special Agent Larry E. McCann of the Virginia State Police, to assist him in the investigation because of McCann's training in the field of behavioral profiling, or criminal investigative analysis. In particular, McCann produces profiles, or "composites of the major personality and behavioral characteristics of [an] unknown offender," by examining crime scenes and victimology. The profile is then used by law enforcement officials in their investigation of a subject offense.
 
 
 8
 Poe related to McCann the circumstances of the rape and the evidence uncovered by investigators relating to the attacker's method of entry into the victim's house. Poe additionally gave McCann the victim's description and her attacker's height and build. Moreover, Poe told McCann that although the victim had initially indicated to investigators that she thought her attacker was white from his accent, she was unable conclusively to identify the race of her attacker because he wore a mask and gloves during the rape. McCann was also told that a dog had tracked to Eric Land's house, but that both Eric and his brother had been eliminated as suspects at that point. McCann did not visit the crime scene and did not personally review any of the evidence developed by Powhatan County investigators. All of the information which McCann considered was provided to him secondhand by Poe.
 
 
 9
 McCann, analyzing the information given to him by Poe, told Poe that the attacker "probably" had the following characteristics: (1) young black male (age 16 to early 20s) or a "severely screwed up" white male, (2) lives with older female and possibly sisters, (3) lives close to the victim, (4) selects victims by peeping, (5) has been in minor trouble with police previously, (6) walks or rides a bike, (7) is meek, quiet, shy, retiring, (8) is often out at night, and (9) has had prior contact with the victim, perhaps as a laborer for the victim. Following that initial conference with McCann, Poe spoke to the neighbors and family of the victim, in an effort to identify "anyone that had contact with her out of the normal personal scope of contact...." As a result of this inquiry, Poe developed a list of fifteen to twenty names of potential suspects. The list was compiled by looking primarily for men who had some contact with the victim, met the general physical description provided by the victim, had a "northern" accent, and lived in the general area.
 
 
 10
 Poe's investigation of the potential suspects occurred in no particular order. As the investigation progressed, three or four suspects consented to giving blood samples, which eliminated them from further investigation. Another potential suspect--a white male--died shortly after the investigation began. Appellant Simmons was eventually added to Poe's list of potential suspects.
 
 
 11
 In the course of his investigation, Poe consulted with McCann several times. On February 6, 1992, Poe asked McCann to contact authorities at the F.B.I., where McCann had received his training, and consult with them about McCann's analysis. Accordingly, McCann contacted Steve Mardigan at the F.B.I. Academy in Quantico, Virginia. Mardigan informed McCann that the F.B.I. did not handle single sexual assault cases unless there was significant "behavior" demonstrated by the rapist or unless violence was involved. Mardigan stated that if the analyst did want to "profile" the case, the profile would have to be "highly qualified." By "highly qualified," McCann understood Mardigan to mean that, in the interest of helping the investigators, a profile could be given as an investigative tool, but that it should be made clear that the profile was based only on the available information, and that more information would be desirable. Specifically, Mardigan would not commit himself to the inclusion of the race identification factor in the profile.
 
 
 12
 On February 10, 1992, McCann relayed to Poe the substance of his conversation with Mardigan. McCann told Poe that the F.B.I. would not commit to the inclusion in the behavioral profile of the probable race of the suspect. On that occasion, McCann again provided Poe with a number of potential characteristics to aid in the identification of the attacker. Most of those characteristics were the same as those suggested to Poe on January 27: The rapist (1) lives in, works in, or visits the area where the victim lives, (2) has an inadequate personality, (3) is gentle, passive, and quiet, (4) is unmarried or married to a significantly younger or "very ugly" wife, (5) is non-athletic, (6) resides with an older female relative, (7) is a loner with few friends, and (8) works in a menial job with little public contact. McCann, however, omitted from this behavioral profile any race identifier. Indeed, after informing Poe that the F.B.I. would not commit to the inclusion of a race characteristic in the profile, McCann never again gave Poe information regarding the possible race of the perpetrator.
 
 
 13
 Poe eventually consulted again with McCann regarding the "short list" of five to ten suspects developed by Poe. These suspects included:
 
 
 14
 (1) John Burruss, white male, ruled out by his height (6'3").
 
 
 15
 (2) Mark Land, white male, ruled out by his height (6'3").
 
 
 16
 (3) Eric Land, white male, whose physical description fit that given by the victim and who lived in close proximity to the victim. A dog had tracked to his house the morning after the attack.
 
 
 17
 (4) James Toombs, black male, who also met the physical description and lived near the victim. He was ruled out by alibi.
 
 
 18
 (5) Andrew Szenasy, white male. He also met the physical description and worked in the area. Poe described him as having a menial job and probably learning disabled. He was eliminated as a suspect after he consented to a blood test.
 
 
 19
 (6) Danny White, black male, Rowland Fields, (race unknown), and Bolinger, white male. These three men had moved furniture across the street from the victim's house some time prior to the rape. Bolinger was disqualified from consideration due to his age. The others agreed to a blood test.
 
 
 20
 (7) James Simmons, black male, the Appellant.
 
 
 21
 Of these suspects, Poe recalls discussing three of four with McCann, "probably" Simmons, Eric Land, and Szenasy.
 
 
 22
 At 5'10" tall and 160 pounds, Simmons met the general physical description of the rapist. He was born and lived in New Jersey, so had a "northern" accent. Moreover, Simmons and his mother had washed the windows on the victim's home on two consecutive days approximately ten weeks prior to the attack, a significant fact because the attacker had broken into the victim's home through the windows.
 
 
 23
 As noted above, most of the potential suspects on Poe's short list were disqualified after they voluntarily agreed to a blood test, or because other factors such as age, physical description, or alibi, eliminated them from serious consideration as suspects. Simmons and Eric Land, however, could not immediately be eliminated as suspects, and neither submitted to a blood test. Accordingly, Poe sought search warrants for both men in order to obtain blood samples for analysis.
 
 
 24
 Poe drafted the affidavit for Simmons's search warrant and submitted it to Magistrate Julian Boyer on March 12, 1992. In drafting the warrant application, Poe used portions of the profiles given to him by McCann on both January 27 and February 10. Poe incorporated into the application those parts of the profiles which matched Simmons, including the race characteristic used in McCann's first analysis. The characteristics that Poe specifically mentioned in the warrant affidavit as applying to Simmons included:
 
 1. black male
 
 25
 2. has been in minor trouble with police previously (Simmons had been arrested on drug charges in New Jersey and had bad check charges in Virginia)
 
 3. 25 years or older (Simmons was 29)
 
 26
 4. lives with older female or sister (Simmons resided with an aunt several years prior to building his own home)
 
 
 27
 5. employed in a menial, non-public contact job (was employed as laborer and as companion to critically ill persons)
 
 
 28
 6. had some casual contact with the victim in the past (Simmons had washed windows on 2 days).
 
 
 29
 In addition, Poe acknowledged in the affidavit that certain elements of the profile could not be objectively characterized as matching Simmons, in particular:
 
 
 30
 1. described by friends or people in community as quiet or shy
 
 2. gentle and passive
 
 31
 3. classified as "Mama's boy"
 
 4. inadequate personality
 
 32
 5. classified as a loner.
 
 
 33
 Poe, moreover, specifically omitted from the affidavit elements of the profile which were inconsistent with Simmons:
 
 
 34
 1. lives or works nearby to the victim (Simmons actually lived several miles from the victim)
 
 2. non-athletic
 
 35
 3. single, or married to significantly younger or unattractive woman (Simmons was in fact married, and not to a woman younger than him)
 
 
 36
 4. if not a young black male, then a "really screwed up" white male.
 
 
 37
 Poe explained that he included in the warrant application only the profile factors that fit Simmons. Poe did not consult with McCann about which characteristics to include in the affidavit, and did not review the affidavit with McCann before submitting it to the magistrate with his application for the search warrant. Beyond providing Poe with the profile characteristics early in the investigation and consulting with him on occasion throughout the investigation, McCann's involvement in the drafting of the affidavit was limited to responding to Poe's request for his credentials.
 
 
 38
 Poe obtained a search warrant from Magistrate Boyer on March 12, 1992, and executed it shortly thereafter. Simmons was taken into custody pursuant to the warrant, and a sample of blood was obtained. DNA testing of the blood eliminated Simmons from further consideration as a suspect, and no further action was taken with respect to him during the remainder of the investigation.
 
 
 39
 Poe also submitted an affidavit for a search warrant to obtain a blood sample from Eric Land, who remained a potential suspect throughout the entire investigation. Poe, however, did not use the profile to establish probable cause as to Land. A search warrant was issued for Land, but before Poe could execute it, another individual, Kenneth Ray Pack, a white male, was apprehended in connection with a similar rape, and subsequently pleaded guilty to the January 25 rape.
 
 
 40
 On October 21, 1993, Simmons filed an amended complaint in the United States District Court for the Eastern District of Virginia alleging: (1) that the Appellees violated 42 U.S.C. Sec. 1985(3) by conspiring to cause Simmons's seizure and the removal of his blood pursuant to an illegal search warrant; (2) that the Appellees violated 42 U.S.C. Secs. 1983 and 1985(3) by using and conspiring to use a racist profile to effect the investigation, search and seizure and arrest of African-American males; and (3) that Appellees Poe and McCann violated 42 U.S.C. Sec. 1983 by deliberately omitting material exculpatory information from the search warrant application and affidavit. By an order dated February 3, 1994, the District Court denied Simmons's motion for partial summary judgment, and granted the Appellees' motions for summary judgment as to the claims against Superintendent Huggins and as to the section 1985(3) conspiracy claim. Moreover, the District Court granted Magistrate Boyer's motion to dismiss, denied Simmons's cross-motion for summary judgment, denied class certification, and denied Poe's and McCann's claims of entitlement to qualified immunity.
 
 
 41
 On March 2, 1994, Simmons filed a renewed motion for partial summary judgment as to the section 1983 claims. Before that motion was denied, Poe and McCann filed notices of appeal from the District Court's denial of their claims of qualified immunity. In response, Simmons filed a motion to certify the appeal as frivolous, upon which Poe and McCann voluntarily withdrew their appeals, preserving their right to appeal the qualified immunity issue at a later time. The District Court then entered its final order, dated April 11, 1994, granting the Appellees summary judgment as to the remaining claims.
 
 
 42
 Simmons filed a timely notice of appeal on May 29, 1994, challenging the District Court's final order. Appellees Poe and McCann also noted their cross-appeals from the District Court's February 3, 1994 order denying their claims of entitlement to qualified immunity. We now affirm the District Court's final order in all aspects as to the section 1983 and 1985 claims, but reverse its finding that Appellees Poe and McCann were not entitled to qualified immunity.
 
 I. Section 1985(3) Conspiracy Claim
 
 43
 The Appellant first alleges that the District Court erred in granting summary judgment to Appellees Poe and McCann on the section 1985(3) conspiracy claim on the grounds that Simmons had failed to show that McCann had "conspired" with Deputy Sheriff Poe to deprive Simmons of his constitutional rights. Because the law is well settled that merely conclusory allegations of conspiracy, unsupported by a factual showing of participation in a joint plan of action, are insufficient to support a section 1985(3) action against a motion for summary judgment, we affirm the District Court's dismissal of the claim.
 
 
 44
 Section 1985 of Title 42 of the United States Code provides:
 
 
 45
 If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 46
 42 U.S.C. Sec. 1985(3).
 
 
 47
 The law is well settled that to establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir.1985); see also Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971). Moreover, the law is well settled that to prove a section 1985 "conspiracy," a claimant must show an agreement or a "meeting of the minds" by defendants to violate the claimant's constitutional rights. See Caldeira v. County of Kauai, 866 F.2d 1175, 1181 (9th Cir.1989), cert. denied, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989); see also Lenard v. Argento, 699 F.2d 874, 882-83 (7th Cir.1983), cert. denied, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (a civil conspiracy under section 1985 is a combination of two or more persons acting in concert to commit an unlawful act, the principal element of which is an agreement or single plan between the parties to inflict a wrong against or injury upon another).
 
 
 48
 This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion. Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts. In Gooden v. Howard County, 954 F.2d 960 (4th Cir.1992) (en banc), for example, we rejected a section 1985 claim brought by an African-American apartment tenant against police officers who had responded to a report of a disturbance at an apartment complex, and had subsequently taken the tenant for an emergency psychiatric evaluation under the mistaken assumption that she was mentally ill. In dismissing the appellant's section 1985 conspiracy claim, we held:
 
 
 49
 To avoid evisceration of the purposes of qualified immunity, courts have [ ] required that plaintiffs alleging unlawful intent in conspiracy claims under Sec. 1985(3) or Sec. 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss. Here, plaintiff fails to satisfy that requirement. The Sec. 1985(3) claim was essentially an afterthought with little more to support it than the respective racial identities of the individuals involved. The mere statement, however, that the officers in question and Ms. Beck were white and Ms. Gooden was black cannot suffice to overcome the fact that the officers acted upon the basis of a citizen's complaint, confirmed repeatedly by their own observations, that Ms. Gooden was in distress. Nor has Ms. Gooden presented any evidence of a conspiracy of two or more persons as required to state a claim under Sec. 1985(3).
 
 
 50
 954 F.2d at 969-70 (emphasis added); see also Scott v. Greenville County, 716 F.2d 1409, 1424 (4th Cir.1983) (rejecting the allegation that private citizens were liable for section 1985(3) conspiracy simply because they wrote letters and spoke at public meetings in opposition to low-income housing in an effort to influence the County Council's actions, because there was "no joint plan of action"); Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1006-07 (4th Cir.1987), cert. denied, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987) (dismissing a section 1985(3) claim alleging conspiracy on the basis of age, because there was no direct or indirect proof of participation in any conspiracy by appellees).
 
 
 51
 Under this relatively stringent standard for establishing section 1985 conspiracies, it is clear that Simmons did not put forth sufficient evidence that Appellees, McCann and Poe, "conspired" or participated in any joint plan, to deprive him of his constitutional rights under section 1985(3).
 
 
 52
 First, it is uncontested that McCann acted only as an advisor in the investigation, and that Poe, on his own, drew up the warrant application for consideration by the magistrate. McCann played no role in applying or executing the search warrant on Simmons, and thus, did not explicitly or implicitly conspire with Poe to deprive Simmons of his constitutional rights. The extent of McCann's involvement with the warrant was his suggestion to Poe that the attacker would "probably" have certain characteristics; moreover, in McCann's modified list of characteristics provided to Poe on February 10, 1992, McCann actually deleted the race factor from the behavioral profile. Thus, Poe's decision to include race in the warrant affidavit was an independent decision, neither endorsed nor encouraged by McCann. Indeed, McCann was aware that Poe's pool of suspects included a fairly even distribution of blacks and whites. There was certainly no "meeting of the minds" sufficient to support a section 1985(3) claim.
 
 
 53
 Second, Simmons's argument that McCann is nevertheless a participant in a section 1985(3) conspiracy because of his "wilful blindness," is wholly unsupported by the law. Indeed, the law is clear that although an express agreement is not necessary, the "participants in the conspiracy must share the general conspiratorial objective.... [I]t simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.' " Lenard, 699 F.2d at 882-83 (citations omitted). The Appellant's allegation that McCann is somehow liable because of his alleged "wilful blindness" to Poe's decision to include the race factor in his warrant application, simply does not meet such a standard.
 
 
 54
 Third, and related, Simmons's argument that McCann "did nothing to dissuade Poe from including the race identification in the Profile presented to the Magistrate," is wholly unsupported by the facts of the case. Indeed, although McCann certainly permitted Poe to use his credentials in the warrant application, McCann specifically told Poe that he had consulted with a colleague at the F.B.I., and refused to endorse the use of the race identification factor in the profile. Moreover, a failure to dissuade Poe, absent an affirmative duty to do so, certainly does not amount to engaging in a "joint plan of action" for the purpose of establishing a section 1985(3) conspiracy.
 
 
 55
 Accordingly, we affirm the District Court's decision on motion for summary judgment to dismiss the Appellant's section 1985(3) conspiracy claim against Appellees, Poe and McCann.
 
 
 56
 II. Sufficiency of Search Warrant Application
 
 
 57
 The Appellant next contends that the District Court erred in dismissing his section 1983 claim on the grounds that the search warrant application contained sufficient facts independent of the "behavioral profile" to establish probable cause. Under the proper de novo standard for reviewing grants of summary judgment, we find that the District Court did not err in granting summary judgment in favor of the Appellees on the section 1983 claim because there indeed existed sufficient independent evidence in the warrant application to justify the magistrate's finding of probable cause. Thus, notwithstanding the propriety or impropriety of including the race factor in the affidavit, the search warrant was properly issued and executed.
 
 
 58
 The case law of the Fourth Circuit clearly evidences this Court's general willingness to affirm, under a highly deferential standard of review, a magistrate's finding of probable cause. Moreover, the case law establishes that, even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause. See United States v. Smith, 730 F.2d 1052, 1056 (6th Cir.1984); United States v. Williams, 633 F.2d 742, 745 (8th Cir.1980); James v. United States, 418 F.2d 1150, 1152 (D.C.Cir.1969). Thus, unless the tainted information is so important that "probable cause did not exist without it," the warrant will be deemed valid. Smith, 730 F.2d at 1056.
 
 
 59
 This Court has always applied a highly deferential standard of review in considering the sufficiency of a finding of probable cause by a magistrate. In United States v. Jones, 31 F.3d 1304 (4th Cir.1994), the Fourth Circuit, in addressing whether the Fourth Amendment requires suppression of certain evidence obtained by postal inspectors pursuant to a search warrant, recently re-articulated the well-established standard under which search warrants issued by magistrates should be reviewed by appellate courts. In finding that the search warrant obtained by the inspectors in Jones was indeed supported by sufficient indicia of probable cause to justify the postal search in that case, this Court held:
 
 
 60
 In order to establish probable cause, the facts presented to the magistrate need only "warrant a [person] of reasonable caution in the belief" that contraband or evidence of a crime will be found in the place to be searched. The probable cause standard "does not demand any showing that such a belief be correct or more likely true than false." The decisions of the Supreme Court, as well as our more recent efforts, consistently establish that "[g]reat deference is to be given a magistrate's assessment of the facts when making a determination of probable cause." Applying this level of deference, our inquiry is directed to whether the magistrate had a "substantial basis" for his conclusion that probable cause existed.
 
 
 61
 31 F.3d at 1313 (emphasis added) (citations omitted). Under this standard, we found that the warrant which the postal inspectors obtained before searching the interior of the appellant's van was supported by sufficient indicia of probable cause to pass constitutional muster. Id.; see also United States v. Clyburn, 24 F.3d 613, 617, 618 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 274, 130 L.Ed.2d 192 (1994) (finding that a magistrate's determination of probable cause "should be paid great deference by reviewing courts" and is supported when there is a "fair probability" that the thing for which the police are searching will be found in the place to be searched), citing to Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590-91, 21 L.Ed.2d 637 (1969), and Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).
 
 
 62
 Under this Court's deferential and well-established standard for reviewing probable cause determinations by magistrates, therefore, the search warrant at issue in the instant case was sufficiently supported by evidence of probable cause, even without the race factor consideration, to pass constitutional muster under the Fourth Amendment. Thus, we affirm the District Court's summary judgment dismissal of the Appellant's section 1983 claim on those grounds.
 
 
 63
 First, even absent the inclusion in the affidavit of certain of the "profile" characteristics generated by Appellee McCann, the warrant application filed by Appellee Poe contained several facts pointing to a "fair probability" that Simmons was the purported attacker in the instant case, and thus provided a "substantial basis" for the magistrate's decision to issue the warrant. Those factors included: (1) that Simmons helped clean the victim's windows ten weeks before the crime, (2) that Simmons therefore had the opportunity to unlock the window, (3) that the point of entry into the home was a window, which was unlocked, (4) that the perpetrator tried to conceal the point of entry, (5) that the attacker was able to move quietly through the home to the victim's bedroom even though the home was "very dimly lit," indicating that the assailant had previous knowledge of the layout of the home, (6) that Simmons's New Jersey accent fit the victim's description of the attacker as having a "mild," "Northern" voice, (7) that Simmons's physical description fit the description of the attacker given by the victim, (8) that Simmons failed to keep several appointments with Appellee Poe for an interview regarding the investigation into the rape, and (9) that Simmons knew that the victim resided alone. Those facts alone suggest that there was a "fair probability" that Simmons was the attacker, and that the Appellee Magistrate therefore certainly had a "substantial basis" for concluding that there existed probable cause to justify issuance of a search warrant.
 
 
 64
 Second, the Appellant's argument that the warrant application was lacking because nothing in the application indicated what Simmons's "motive" for the rape might be, is wholly unavailing. Indeed, nowhere does the case law indicate that proof of "motive" is a necessary element of a proper probable cause determination. Moreover, because rape is not a crime in which specifically articulated motive generally plays a large role, the Appellant's argument that an essential element of probable cause is missing from the application is simply unfounded.
 
 
 65
 Third, notwithstanding the existence of sufficient evidence of probable cause, even without the race factor, to support the issuance of the search warrant, the Appellant's argument that the search warrant was racially motivated is unsupported by the facts. Indeed, the race factor was only one factor in an entire behavioral profile consisting of eleven separate characteristics, indicating that race was not necessarily the motivating factor underlying the Appellees' decision to seek and issue the search warrant against Simmons. Moreover, there is no evidence to suggest that race played any part in the consideration of Simmons as a possible suspect where the eleven suspects on Poe's "short list" were evenly divided racially, and where the one other suspect for whom a search warrant was sought--Eric Land--was a white man; indeed, of the eleven suspects investigated in connection with the rape, six were white and five were black.
 
 
 66
 Finally, the case law plainly establishes that an appellate court must accord great deference to a magistrate's finding of probable cause. Indeed, the Supreme Court has held that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984). Thus, the magistrate's determination should be overturned in this case only if there is no "substantial basis" for concluding that probable cause existed. Id. at 915, 104 S.Ct. at 3416-17. In light of the discussion above, there can be no doubt that such a substantial basis for a finding of probable cause existed in the instant case.
 
 III. Denial of Class Certification
 
 67
 Appellant, in the proceedings below, alleged as part of his section 1983 claim that even if there existed probable cause for his seizure, the use of the race profile by the police constituted a violation of the constitutional rights of all African-American males in the Commonwealth of Virginia. In the instant appeal from the dismissal of that claim, Simmons contends that the District Court erred in denying his request to certify a class of all African-American males "presently, or in the future, residing in, or being in, the Commonwealth of Virginia." Because the District Court did not abuse its discretion in finding that class certification was inappropriate in light of the fact that the Appellant's claim involved unique responses to a specific crime, and that Simmons faced no possibility of a continuing violation of his rights, we affirm the District Court's decision.
 
 
 68
 Rule 23(a) of the Federal Rules of Civil Procedure provides that a class action is allowable only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there exist questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the entire class. Fed.R.Civ.P. 23(a). In addition, Rule 23(b) provides that class certification would have been proper in this case only if the District Court found that questions of law or fact common to the members of the class "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).
 
 
 69
 This Court, in reviewing the class certification decisions of district courts under Rule 23, has generally accorded great deference to the district court's determinations, particularly where the class to be certified is unified solely on the basis of common racial identity or gender. In Adams v. Bethlehem Steel Corp., 736 F.2d 992 (4th Cir.1984) (per curiam), for example, this Court found that a request for class certification in a racial discrimination action against an employer was properly denied by the district court, where the plaintiffs had alleged that Bethlehem Steel Corporation, by using thirty-seven general employment practices, allegedly discriminated against all black employees and applicants for employment with the corporation. 736 F.2d at 994. In finding that the district court properly denied class certification for all black employees and applicants of the company, we specifically rejected the plaintiffs' attempt to establish a nexus between their individual claims and those of the putative class members by simply informing the court that they would proceed on an "across the board" theory under which the typicality requirement of Rule 23 would be satisfied, by definition, by virtue of the fact that racial discrimination was at issue. Id. In so rejecting this argument, we also dismissed the appellants' argument that class certification was warranted because the "mere existence" of the allegedly discriminatory policies had an adverse effect upon all black employees, who purportedly suffered identical harm; indeed, we dismissed the "mere existence" argument as intended "only as a means of procuring class certification." Id. In particular, we held:
 
 
 70
 [Rule 23's typicality and commonality requirements] are requirements that must be met as a predicate to class certification, .... "All blacks and females have an interest in being free from discrimination in employment. In a very broad and loose sense, any member of any such class who suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but clearly that is not [a ground for class certification]."
 
 
 71
 Id. at 995 (citations omitted). Accordingly, the Court affirmed the District Court's denial of certification. See also Kidwell v. Transportation Communications International Union, 946 F.2d 283, 305 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992) (finding that typicality and commonality requirements are not met merely by showing the existence of a wrong without an identifiable injury to each class member); Boley v. Brown, 10 F.3d 218, 223 (4th Cir.1993) (finding that class certification was properly denied under an abuse of discretion standard where any resulting harm was dependent upon consideration of unique circumstances pertinent to each class member). Cf. Bazemore v. Friday, 848 F.2d 476, 481-82 (4th Cir.1988) (finding that class certification of "all black employees of the Extension Service on or after November 18, 1971" was appropriate in an action in which the plaintiffs claimed they were paid less than white employees by the North Carolina Agricultural Extension Service and where there existed an actual salary disparity between all white and black employees of the Service).
 
 
 72
 Accordingly, we find, for several reasons, that the District Court did not abuse its discretion in denying class certification to all African-American males residing in Virginia. First, the use of the race factor here was unique to the instant case, thus precluding the satisfaction of Rule 23's typicality requirement for class certification. Indeed, the search warrant at issue in the instant case was the product of the police's investigation of a single crime, based on unique victimology, physical evidence, and behavior of the assailant. Because the challenged profile included in the affidavit listed eleven specific characteristics developed by Appellee McCann based on his understanding of the particular attack and rape, the facts of this case, contrary to the Appellant's assertion, could not apply to all African-American males presently, or in the future, residing in the Commonwealth. Indeed, the eleven-factor profile--including such characteristics as living with a female relative and being a "loner"--could, by definition, only apply to a small subset of all the African-American males in the state of Virginia. Thus, class certification would have been improper here.
 
 
 73
 Second, and related, this case does not present questions of law or fact common to all African-American males because Simmons was identified as a suspect in the underlying rape case based on many individualized facts, including the fact that he had washed the victim's windows several weeks prior to the assault. Thus, the use of this profile in the case cannot possibly be typical of the putative class. There are no common issues of law or fact that predominate here.
 
 
 74
 Third, the Appellees in this case did not act on grounds generally applicable to any class. Fed.R.Civ.P. 23(b)(2). Indeed, the Appellees acted on grounds specifically applicable to Simmons as an individual suspect in the underlying rape case--as discussed above, he was not a suspect based solely, or even primarily, upon his race, but rather on particular circumstances unique to his case. Indeed, the suspects being investigated were evenly divided racially, thus suggesting that the investigation of Simmons was not motivated by race.
 
 
 75
 Fourth, the case law evidences that a great deal of deference must be afforded to a District Court's decision to deny certification of a plaintiff class for a class action. Indeed, even if reasonable persons can disagree as to whether the class certification decision was proper, the District Court's decision certainly does not amount to an abuse of discretion.
 
 
 76
 Finally, and most important, it is not enough under the case law for Simmons simply to argue that all African-Americans could potentially be harmed by the use of the race profile in some cases. The case law clearly holds that the "mere existence" of a potential harm is not enough to justify class certification; actual injury to each class member must be shown. In the instant case, Simmons does not, and cannot, make such a showing.
 
 
 77
 IV. Denial of Declaratory and Injunctive Relief
 
 
 78
 Simmons next contends that the District Court erred in denying declaratory and injunctive relief under 42 U.S.C. Sec. 1983, alleging that even if the warrant application had sufficiently supported a finding of probable cause, he was entitled to relief merely on the basis of the police's allegedly unconstitutional use of the "race profile" in its warrant application. In so contending, Simmons appears to argue that the use of the race profile is a per se violation of his constitutional rights justifying injunctive relief. Because this argument is unsupported by the law, we affirm the District Court's decision.
 
 
 79
 The law is well settled that federal injunctive relief is an extreme remedy. In Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), a case similar to the one at bar, the Supreme Court considered a case filed by a petitioner against the City of Los Angeles and some of its police officers, alleging that he had been seized and applied a chokehold that rendered him unconscious and caused damage to his larynx; in addition to damages, the petitioner sought injunctive relief which would bar the use of chokeholds except where the proposed victim reasonably appeared to be threatening the immediate use of bodily force. 461 U.S. at 97-98, 103 S.Ct. at 1662-63. The Supreme Court, in rejecting the petitioner's injunctive relief claim, held that petitioner Lyons was not entitled to equitable remedy, even if he had proper standing to seek an injunction:
 
 
 80
 The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again--a "likelihood of substantial and immediate irreparable injury." The speculative nature of Lyons' claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.
 
 
 81
 Id. at 111, 103 S.Ct. at 1670 (emphasis added). In so holding, the Court reaffirmed its decision in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), in which it held that injunctive relief was not appropriate to end alleged widespread unconstitutional conduct aimed at minority citizens because "past wrongs do not in themselves amount to that real and immediate threat of injury...." Id. at 103, 103 S.Ct. at 1666. Moreover, the Court found that Lyons had an adequate remedy at law for any damages that may have ensued from his injuries, such that injunctive relief was not warranted. Id. at 113, 103 S.Ct. at 1671. The Court concluded, "Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." Id. at 111, 103 S.Ct. at 1670.
 
 
 82
 Accordingly, we affirm the District Court's decision to deny Simmons's claim for declaratory and injunctive relief under 42 U.S.C. Sec. 1983. First, it is clear that Simmons does not meet the standard articulated in Lyons for the granting of injunctive or declaratory relief. Because Simmons was released from police custody and eventually eliminated from the list of suspects in the case, he cannot show either a continuing wrong or a real or immediate threat that he would likely be irreparably injured by the use of the race profile in the instant case. Under the case law, a future or conjectural threat of injury is insufficient to justify injunctive relief.
 
 
 83
 Second, the Appellant's argument that the District Court used the wrong legal analysis in denying injunctive relief is unsupported by the law. Simmons argues that the District Court should not have rejected his section 1983 claim on the perceived existence of independent probable cause, and should instead have analyzed the claim consistent with "mixed motive" civil rights and protected conduct cases. This is incorrect for several reasons. First, the case cited by Appellant in support of his argument, Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), addressed an instance in which injunctive relief was appropriate because the petitioner was suffering a continuing harm--he had been fired from a job and continued to be jobless; thus he, unlike Simmons, satisfied the Lyons requirement. Second, Mount Healthy expressly addressed the petitioner's ability to engage in First Amendment conduct without fear of losing his job; in the instant case, there is no dispute over whether Simmons engaged in constitutionally protected conduct that made him vulnerable to his becoming a suspect in the rape. Third, and most important, Simmons fails to show that racial stereotyping even occurred, much less that it was a "substantial" or "motivating" factor in the issuance of the search warrant; thus, even under his own "mixed motive" test, Simmons's claim must fail. Indeed, Simmons's sole evidence of racial stereotyping is his reference to a number of literary works discussing race stereotyping of black males since Reconstruction as rapists; not once did the Appellant show that McCann or Poe were actually motivated by racial animus in including the race factor in the behavioral profile. Accordingly, we affirm the District Court's decision to dismiss the Appellant's claims for declaratory and injunctive relief under 42 U.S.C. Sec. 1983.
 
 V. Violation of Franks v. Delaware Rule
 
 84
 The Appellant next alleges that because Appellee Poe omitted from his warrant application relevant evidence suggesting that Simmons may not be the purported rapist, the District Court erred in denying Simmons a hearing on the facial validity of the warrant under the rule of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Because the Appellant's argument is unsupported by the law of this Court, we affirm the District Court's decision.
 
 
 85
 This Court has construed the Supreme Court's opinion in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), very strictly, finding in large part that Franks hearings are not required unless an omission from a warrant affidavit is the product of a deliberate falsehood or done in reckless disregard of the truth. In United States v. Colkley, 899 F.2d 297 (4th Cir.1990), this Court articulated the two-pronged standard under which Franks claims must be analyzed. In that case, we addressed whether an evidentiary hearing was required under Franks where the defendant challenged the affidavit used in support of his arrest warrant on the grounds that it failed to note that numerous witnesses did not identify him in a photographic spread, and because the police officer based the height description of the defendant in disregard of the testimony of some witnesses. 899 F.2d at 299. In finding that a Franks hearing on the facial validity of the affidavit was not warranted, we articulated a two-part threshold test for making such a determination: a Franks hearing is warranted if (1) the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a warrant affidavit, and (2) the defendant shows that the false information was essential to the probable cause determination. Id. at 300. In articulating this standard, we expressly noted:
 
 
 86
 Franks clearly requires defendants to allege more than "intentional" omission in this weak sense. "The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit." Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate. To obtain a Franks hearing the defendant must show that the omission is the product of a "deliberate falsehood or of reckless disregard for the truth." "[M]ere[ ] negligen[ce] in ... recording the facts relevant to a probable-cause determination" is not enough.
 
 
 87
 Id. at 301 (emphasis in original) (citations omitted). Under this standard, this Court found that the omissions from the affidavit did not meet the standard because there was no evidence that the police officer had the requisite intent to mislead, only that the officer did not believe the omitted information to be relevant to the probable cause determination. Id. In so holding, the Court found that (1) the officer's acts "fell far short of the level of flagrant police action Franks is designed to prevent, and a hearing under that decision was not required"; and (2) that the district court could not have inferred intent or recklessness from the fact of omission itself. Id. Additionally, the Court found that in any case, the omitted information lacked materiality to the probable cause determination:
 
 
 88
 [T]o be material under Franks, an omission must do more than potentially affect the probable cause determination: it must be "necessary to the finding of probable cause." For an omission to serve as a basis for a hearing under Franks, it must be such that its inclusion in the affidavit would defeat probable cause for arrest. Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearing.
 
 
 89
 Id.; see also Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir.1994), cert. denied --- U.S. ----, 115 S.Ct. 1103, 130 L.Ed.2d 1069 (1994) (finding that a Franks hearing was not necessary where a police officer included in his affidavit a sworn statement that the defendant "received" a parking ticket, because the allegedly false statement was not necessary to the finding of probable cause); United States v. Jeffus, 22 F.3d 554, 558 (4th Cir.1994) (finding that a Franks hearing was not required to question the veracity of information contained in an affidavit because the defendant's challenge was conclusory and not supported with specific contentions of falsity or recklessness).
 
 
 90
 It is clear that Appellant Simmons did not make a sufficient showing to establish his entitlement to a Franks hearing in the instant case. First, the Appellant made no showing that the first prong of Colkley was satisfied--that is, that Appellee Poe knowingly or intentionally made false statements in his affidavit, or made omissions in reckless disregard of the truth. Under the commonsense approach articulated in Colkley, it is apparent that Poe's selection of the profile factors included in the affidavit was not an attempt to mislead the magistrate. Poe simply included all the profile factors that were or could be consistent with Simmons. Poe omitted from the application those profile factors inconsistent with Simmons, just as he omitted other investigative facts inconsistent with Simmons from the application.
 
 
 91
 Second, and related, Poe's "omission" of the fact that the victim had initially believed her attacker to be white was likewise not intentional or made in reckless disregard of the truth. Because the victim never saw her attacker during the rape, her initial "belief" that he was white was tenuous; thus, Poe's omission of that fact from the affidavit was not a deliberate attempt to mislead, but was instead simply an effort thoroughly to investigate the case. Indeed, because other white suspects, such as Eric Land, were investigated, it is unlikely that the omission constituted the type of flagrant police conduct that Franks seeks to prevent.
 
 
 92
 Third, the Appellant does not satisfy Colkley's second prong--that the alleged omission was material to the determination of probable cause. First, because race was only one of several factors included in the warrant application, it is unlikely to have been "necessary" to the magistrate's finding of probable cause. Second, many of the other factors listed, particularly the fact that Simmons had washed the victim's windows sometime before the crime, were more than enough on their own to establish probable cause. There is no indication that the exclusion of the non-race profile factors was "material" to the magistrate's probable cause determination.
 
 
 93
 Fourth, the allegations of recklessness here are merely conclusory and are not supported by specific evidence of any intent to mislead the magistrate. Indeed, the Appellant does not point to any evidence suggesting that Poe omitted certain information in order to mislead or misrepresent. At most, Appellant shows that Poe omitted some things on the genuine belief that they were not relevant to the probable cause determination.
 
 
 94
 Finally, Simmons's argument that Colkley does not apply to situations where the omitted information "renders the included information a falsehood," is simply unsupported by the law. Colkley's holding is in no way limited only to cases in which the omission is "arguably inconsistent" with the information which is included. Moreover, the distinction proposed by Simmons for the purpose of distinguishing Colkley from the instant case is, by Simmons's own admission, "not always entirely clear."
 
 VI. Qualified Immunity
 
 95
 Finally, on cross-appeal, Appellees, Poe and McCann, claim that the District Court erred in denying their claim of qualified immunity. Because the law is clear that police officers are entitled to immunity unless they have violated a "clearly established" constitutional right, we reverse the District Court's denial of the Appellees' claim of entitlement to qualified immunity.
 
 
 96
 The law is well settled that a public official or employee is entitled to qualified immunity for civil damages unless his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This Court, in Pritchett v. Alford, 973 F.2d 307 (4th Cir.1992), articulated this standard fully:
 
 
 97
 The test of qualified immunity for police officers sued under 42 U.S.C. Sec. 1983 is whether in performing discretionary functions, they have engaged in conduct that violates "clearly established constitutional rights of which a reasonable person would have known." Immunity may thus be established either on the basis that the right allegedly (or actually) violated was not at the time one "clearly established," or that, though "clearly established" (and violated), it was one that a "reasonable" person in the officer's position could have failed to appreciate would be violated by his conduct.
 
 
 98
 Id. at 312 (citations omitted). In articulating this standard, the Court held that ruling on a defense of qualified immunity therefore requires three distinct steps: (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate that right. Id. Moreover, the Court held that in determining whether the specific right allegedly violated was "clearly established" at the time of the purported violation, the proper focus is not upon the right "at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Id.; see also Gooden v. Howard County, 954 F.2d 960, 968 (4th Cir.1992) (en banc) (the test of "clearly established law" should not be conducted on a high level of generality).
 
 
 99
 For several reasons, it appears that the District Court erred in denying Appellees' claims of qualified immunity in the instant case. First, it is not clear that there was a violation of any constitutional right in the instant case. Indeed, as argued above, there is no evidence that Appellee Poe sought the search warrant in the instant case based solely on Simmons's race, nor even that he sought the warrant based generally on the profile. Rather Poe included these factors in the search warrant affidavit as part of several factors that supported a finding of probable cause. Thus, it is not at all clear that Simmons's Fourteenth or Fourth Amendment rights were infringed at all.
 
 
 100
 Second, even if there was a constitutional violation, the relevant Virginia case law suggests that the allegedly unconstitutional use of the "race profile," was not "clearly established" at the time of the purported violation. The case relied on by both sides in this case, Lowery v. Commonwealth, 9 Va.App. 314, 388 S.E.2d 265 (1990), is most instructive on this issue. In Lowery, the Virginia Court of Appeals held that the race of the driver of an automobile may not be used in deciding whether a stop of his vehicle is justified, finding instead that an investigative stop of an automobile must be justified by some "objective manifestation" that the person stopped is engaged in criminal activity. 388 S.E.2d at 266. Under this analysis, the Court found that the use of race or national origin for this purpose is invalid and unconstitutional under the Fourth and Fourteenth Amendments. Id. at 267. Despite this finding, however, the Court did not reverse the defendant's conviction, holding instead that where there is an objective justification for a police officer's decision to stop a suspect, the evidence seized need not be suppressed. Id. In upholding the conviction, the Court found that the officer had an objective justification for detaining the defendant independent of race. Id. at 268.
 
 
 101
 Under the holding in Lowery, it is not "clearly established" law that it is unconstitutional for a profile including race, along with other factors, to be included in a warrant application. The only proposition that the case law cited by Simmons establishes is that Virginia courts have found it unconstitutional to use a race profile alone to justify an investigatory stop. Thus, Lowery cannot reasonably be said to have put law enforcement officials on notice that any use of race in a criminal investigation is constitutionally prohibited, especially where, as here, (1) officers are investigating a completed crime rather than merely stopping potential suspects where no crime may have occurred, and (2) where race is only one of many considered factors.
 
 
 102
 Third, for the reasons stated above, a reasonable person in Appellees' shoes would not have known that the inclusion of the profile in the warrant application was constitutionally suspect. Indeed, even if at its most general level, it is clearly established that the use of race by police in investigation is unconstitutional, it is not so clearly established in the particularized context of the instant case.
 
 
 103
 Accordingly, we affirm, on appeal, the District Court's grant of summary judgment in favor of the Appellees, but reverse, on cross-appeal, the District Court's decision in favor of the Appellant on the issue of qualified immunity.
 
 
 104
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 Appellee Huggins, the Superintendent, was sued in his official capacity only, while the other three Appellees were sued in their individual and official capacities