PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1277

BRANDON RAUB,

Plaintiff – Appellant,

v.

MICHAEL CAMPBELL,

Defendant – Appellee,

and

DANIEL LEE BOWEN; RUSSELL MORGAN GRANDERSON; LLOYD C. CHASER; LATARSHA MASON; MICHAEL PARIS; TERRY GRANGER; UNITED STATES OF AMERICA; JOHN DOES 1–10,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, District Judge. (3:13-cv-00328-HEH-MHL)

Argued: January 28, 2015          Decided: April 29, 2015

Before TRAXLER, Chief Judge, and DIAZ and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Chief Judge Traxler and Judge Thacker joined.

**ARGUED:** William H. Hurd, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellant. Stylian Paul Parthemos, COUNTY

ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellee. **ON BRIEF:** Stephen C. Piepgrass, TROUTMAN SANDERS LLP, Richmond, Virginia; John W. Whitehead, Douglas R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia; Anthony F. Troy, Charles A. Zdebski, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Richmond, Virginia, for Appellant. Jeffrey L. Mincks, Julie A.C. Seyfarth, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellee.

DIAZ, Circuit Judge:

In the summer of 2012, Brandon Raub composed a series of ominous Facebook posts, which drew the attention of his former fellow Marines. They contacted the FBI expressing concern, and the FBI--in coordination with local law enforcement--dispatched a team to Raub's Virginia home. After speaking with Raub, and on the recommendation of Michael Campbell, a local mental health evaluator, the local officers detained Raub for further evaluation. Campbell then interviewed Raub and, on the basis of that interview and Raub's Facebook posts, petitioned a state magistrate judge for a temporary detention order, which was granted. Raub was subsequently hospitalized against his will for seven days.

Raub filed suit under 42 U.S.C. § 1983, seeking damages and injunctive relief against Campbell for violating his Fourth Amendment and First Amendment rights. The district court granted summary judgment to Campbell on the basis of qualified immunity, concluding that Campbell acted reasonably in recommending Raub's seizure and further detention. For the reasons set forth below, we affirm.

I.

In reviewing de novo the district court's grant of summary judgment, we recite the facts and all reasonable inferences to

3

be drawn from them in the light most favorable to the non-moving party--in this case, Raub. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

In August 2012, two Marine veterans who had served with Raub during his deployment to Iraq contacted the FBI. They were concerned by Raub's "increasingly threatening" Facebook posts. J.A. 532. In an email, one of the Marines, Howard Bullen, provided specific examples of Raub's posts:

- "This is revenge. Know that before you die."
- "Richmond is not yours. I'm about to shake some shit up."
- "This is the start of you dying. Planned spittin with heart of Lion."
- "Leader of the New School. Bringing Back the Old School. MY LIFE WILL BE A DOCUMENTARY."
- "I'm gunning whoever run the town."
- "W, you're under arrest bitch."
- "The World will Find This."
- "I know ya'll are reading this, and I truly wonder if you know what's about to happen."
- "W, you'll be one of the first people dragged out of your house and arrested."
- "And Daddy Bush, too."
- "The Revolution will come for me. Men will be at my door soon to pick me up to lead it ;)"
- "You should understand that many of the things I have said here are for the world to see."

J.A. 532–33. Although Bullen characterized Raub's statements as "typical extremist language," he also told the FBI that Raub "genuinely believes in this and is not simply looking for attention." Id. at 533. Bullen expressed concern that Raub's "threatening and action-oriented" rhetoric had worsened in recent months. Id.

4

The FBI decided to interview Raub.[1]  Supported by a team comprised of federal and local law enforcement officers, Detective Michael Paris and FBI Agent Terry Granger approached Raub at his home and questioned him about his Facebook posts.

Raub, wearing only a pair of white shorts and speaking to the officers through the screen door of his home, admitted that he wrote the posts.  Although he never threatened violence, Raub refused to answer directly when asked if he intended to commit violence.  At one point, he told Paris and Granger, "[W]e will all see very soon what all of this means."  J.A. 193.

Paris observed that Raub's demeanor shifted wildly over the course of the conversation, alternating between calm and "extremely intense and emotional."  Id.  Raub questioned Paris and Granger about their knowledge of government conspiracy theories--including Raub's theories that the government launched a missile into the Pentagon on 9/11 and that the government exposes citizens to radioactive thorium--and wondered why the officers were not arresting government officials for these crimes.

After interviewing Raub for nearly half an hour, Paris and Granger discussed whether they should detain Raub for a mental

---

[1] Agents had conferred with state and federal prosecutors, who advised that Raub's statements, by themselves, did not provide sufficient grounds for criminal charges.

health evaluation. To that end, Paris spoke by telephone with Michael Campbell, a certified mental health "prescreener" with the local emergency services agency. Paris described Raub's Facebook posts and told Campbell that Raub appeared "preoccupied and distracted" during the interview, with rapid mood swings and roving, intermittent eye contact. J.A. 574. In addition, Paris expressed concern about Raub's military weapons training and his potential access to weapons.[2] Campbell, believing that Raub might be psychotic, recommended that Paris detain Raub for an evaluation.

Raub was placed in custody and transported to the local jail.[3] There, he was handcuffed to a bench in the jail's intake room. Because Raub was not allowed to retrieve his clothes before being detained, he was both shirtless and shoeless when Campbell arrived to speak with him. Campbell asked Raub about the Facebook posts, as well as Raub's beliefs in government conspiracies and an impending revolution. Although Raub said little in response--declining after twelve minutes to answer any

---

[2] The record does not say why Paris thought Raub had access to weapons.

[3] Virginia law requires that a person seized for an emergency detention be taken to an "appropriate location to assess the need for hospitalization or treatment." Va. Code Ann. § 37.2-808(G) (2011).

further questions--when asked whether he felt justified in following through with the threats that had caused his detention, Raub replied, "I certainly do, wouldn't you?" J.A. 576. In addition, he told Campbell, "the revolution is coming," and "if you [k]new of what was coming[,] wouldn[']t you try to stop it[?]" J.A. 705. When asked why he thought the authorities had approached him about his posts, Raub replied, "because they know I am on to them." J.A. 523.

Campbell also noted that Raub appeared preoccupied and distracted and had difficulty answering questions. This behavior, combined with Raub's professed belief in an impending revolution that he was destined to lead, prompted Campbell to conclude that Raub might be paranoid and delusional, and that he was "responding to some internal stimulus." J.A. 576.

After speaking with Raub, Campbell read the email that Bullen had sent to the FBI. Campbell also spoke with Raub's mother, who said that she shared her son's beliefs and had noticed no change in his behavior. Campbell nonetheless concluded that Raub met the statutory standard for involuntary temporary detention,[4] given Raub's "recent change in . . .

---

[4] The statute authorizing temporary detention requires a finding that (1) a person has a mental illness; (2) "there exists a substantial likelihood that, as a result of [that] mental illness, the person will" harm himself or others; (3) the person needs hospitalization or treatment; and (4) the person
(Continued)

7

behavior[] and more severe posts about revolution with plans for action," as reflected in the email.  J.A. 705.

Consequently, Campbell petitioned for and received a temporary detention order from a magistrate judge.  Raub was taken to a hospital, where a psychologist examined him and agreed that Raub exhibited symptoms of psychosis.  Hospital staff thereafter petitioned the state court for an order of involuntary admission for treatment.  After a hearing, held four days after Raub was detained, the court ordered that Raub be admitted for thirty days; however, just three days later, the court ordered Raub released from the hospital, concluding that "the petition [was] . . . devoid of any factual allegations."  J.A. 879.[5]

Raub subsequently filed suit against multiple defendants, alleging claims under state and federal law.  He amended his complaint twice, with the Second Amended Complaint alleging claims under 42 U.S.C. § 1983 against only one defendant-- Campbell.  In addition to damages, Raub also sought to enjoin Campbell from seizing Raub in the future or retaliating against

---

will not volunteer for hospitalization or treatment.  Va. Code Ann. § 37.2-809(B) (2010).

[5] The court provided no further explanation for its conclusion.

8

him based on the exercise of his constitutional rights. The district court granted Campbell's motion for summary judgment on the basis of qualified immunity and denied Raub's request for injunctive relief.

Raub appeals, pressing three arguments. First, he contends that Campbell violated his Fourth Amendment right to be free from unreasonable seizures by recommending that Raub be taken into custody for a mental health evaluation and by petitioning the state court for a temporary detention order. Second, Raub avers that Campbell violated his First Amendment right of free speech by basing his conclusion that Raub was delusional on Raub's Facebook posts and his responses to Campbell's questions. Finally, Raub contends that, even if his constitutional claims fail, he is still entitled to injunctive relief. We address each argument in turn.

II.

We review de novo the district court's decision to grant Campbell summary judgment on the basis of qualified immunity. West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014). Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions. Anderson v. Creighton, 483 U.S. 635, 638–39 (1987).

9

The protection extends to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Indeed, as we have emphasized repeatedly, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." S.P. v. City of Takoma Park, Md., 134 F.3d 260, 266 (4th Cir. 1998) (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

The defense of qualified immunity is broader than a mere defense to liability. Rather, intended to "spare individual officials the burdens and uncertainties of standing trial," it provides for immunity from suit where a state actor's conduct is objectively reasonable under the circumstances. Gooden v. Howard Cnty., Md., 954 F.2d 960, 965 (4th Cir. 1992) (en banc); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (plurality opinion) (noting that qualified immunity is "effectively lost if a case is erroneously permitted to go to trial"). We therefore prefer questions of qualified immunity to be decided "at the earliest possible stage in litigation." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)). And we have recognized that, on a defense of qualified immunity, once a state actor's conduct is established beyond dispute, the question of whether that conduct

10

was reasonable is one of law for the court to decide. Id. at 333.

Our qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. West, 771 F.3d at 213 (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). However, we need not reach both prongs of the analysis. See Pearson, 555 U.S. at 242. Rather, we may address these two questions in "the order . . . that will best facilitate the fair and efficient disposition of each case." Id.

III.

Raub's Fourth Amendment argument is based on the claim that Campbell acted without probable cause in recommending that Raub be taken into custody for a mental health evaluation, and when he petitioned the state court for a temporary detention order. We choose, however, not to reach the question of whether Campbell's conduct amounted to a constitutional violation. Rather, we hold that because Campbell's conduct was not

11

proscribed by clearly established law, summary judgment on the basis of qualified immunity was proper.[6]

In this prong of the qualified immunity analysis, the "inquiry turns on the objective legal reasonableness of [Campbell's] action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244 (internal quotation marks omitted). As a result, we look not to whether the right allegedly violated was established "as a broad general proposition" but whether "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201-02 (2001), as modified by Pearson, 555 U.S. 223; see also S.P., 134 F.3d at 266 (4th Cir. 1998) ("[T]he established contours of probable cause [must have been] sufficiently clear at the time of the seizure such that the

---

[6] We reject Campbell's argument that he cannot be held liable under § 1983 because he was not directly responsible either for Raub's initial seizure or his temporary detention under the magistrate's order. Section 1983 "imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury." Sales v. Grant, 158 F.3d 768, 776 (4th Cir. 1998); see also Malley, 475 U.S. at 344 n.7 (explaining that § 1983 liability extends to the natural consequences of a person's actions). Thus, because Raub's seizure and detention were based, at least in part, on Campbell's recommendation, Campbell is liable under § 1983 unless he is entitled to qualified immunity.

12

unlawfulness of the officers' actions would have been apparent to reasonable officers.").

Raub points to three general reasons why Campbell's conduct was unconstitutional. First, he contends that a reasonable mental health professional would not have relied solely on Detective Paris's report, but rather would have spoken to Raub prior to recommending his initial seizure. Second, he argues that no reasonable mental health professional would have interviewed Raub in a jail intake room, while he was shirtless, shoeless, and handcuffed to a bench. Finally, Raub asserts that no reasonable mental health professional would have concluded on these facts--Raub's Facebook posts, conflicting reports about Raub's behavioral changes, and Raub's statements and behavior during his interview with Campbell--that Raub should be detained for a mental health evaluation.

Our previous decisions concerning seizures for mental health evaluations have indeed emphasized a "general right to be free from seizure" absent a finding of probable cause. Gooden, 954 F.2d at 968. However, we have also noted a distinct "lack of clarity in the law governing seizures for psychological evaluations," compared with the "painstaking[]" definition of probable cause in the criminal arrest context. Id.; see also S.P., 134 F.3d at 266. Although our cases and the governing statutes provide some guidance as to the standards for probable

13

cause to seize someone for a mental health evaluation, we are aware of no case clearly proscribing Campbell's conduct, or even conduct similar to it.

Rather, all of our decisions involving mental health seizures have involved circumstances in which law enforcement officers seized an individual because they feared he or she might be a danger to him- or herself. In most of these cases, we granted qualified immunity to the seizing officers. For example, in Gooden, officers were twice called to an apartment complex on reports of screams emanating from one of the apartments. 954 F.2d at 962. On the second occasion, the officers personally heard "blood-chilling" screams and other strange noises coming from the apartment. Id. However, when the officers spoke with the woman who lived in the apartment, she denied hearing or making any such noises (although she did admit to "yelping" once because she had burned herself on an iron). Id. Nevertheless, the woman appeared to have been crying, and the officers were concerned that she was "mentally disordered" and might pose a danger to herself. Id. at 963. As a result, they took her to a nearby hospital for evaluation. Id. at 964.

In our en banc reversal of the panel's decision to affirm the district court's denial of qualified immunity, we held that the officers' conduct was reasonable, as they acted on the basis

14

of multiple complaints, personal observations, and their own investigations. Id. at 966. We also found relevant the fact that the officers acted pursuant to a Maryland law authorizing mental health seizures. Id.

We came to a similar conclusion in S.P. There, officers responded to an emergency dispatch and found the plaintiff at her home, crying and distraught. 134 F.3d at 264. She admitted that she had had a "painful argument" with her husband but denied having thoughts of suicide or depression. Id. at 264, 267. At the same time, however, she told the officers that, if not for her children, "she would have considered committing suicide." Id. at 267. Because of the woman's demeanor and the officers' concern that she may cause harm to herself, the officers took her to a nearby hospital for evaluation. Id.

Again, we concluded that because the officers "had ample opportunity to observe and interview" the plaintiff, "did not decide to detain [her] in haste," and acted pursuant to state law authorizing mental health seizures, they acted reasonably in detaining the plaintiff. Id. at 267-68. Moreover, we noted that, just as in Gooden, even though the plaintiff "exhibited no signs of physical abuse and denied any psychiatric problems," the officers acted reasonably in relying on their perceptions of the plaintiff as "evasive and uncooperative." Id. at 268.

15

In contrast, in Bailey v. Kennedy--notably, the only case in which we have denied qualified immunity for seizures in the mental health context--law enforcement officers detained the plaintiff based solely on a 911 report that he was intoxicated, depressed, and suicidal. 349 F.3d 731, 734 (4th Cir. 2003). There, the officers responded to the plaintiff's home, where they found him sitting at his dining room table eating lunch. He denied thoughts of suicide, declined to give the officers permission to search the house, and asked them to leave. Id. The officers did not see weapons or other indicia of a potential suicide in the house.

After leaving, the officers decided they "ha[d] to do something" and returned to knock on the door. Id. at 735. When the plaintiff told them the suicide report was "crazy" and that the officers needed to leave, the officers instead entered his home and subdued him by handcuffing him and striking him multiple times in the face. Id. We concluded that "the 911 report, viewed together with the events after the police officers arrived, was insufficient to establish probable cause to detain [the plaintiff] for an emergency mental evaluation." Id. at 741.

When confronted with a similar situation in Cloaninger, we distinguished that case from Bailey on the ground that the law enforcement officers had more information than the "mere 911

16

call in Bailey." 555 F.3d at 333. There, police officers were summoned to Cloaninger's home after he called a VA hospital seeking medical help, and a police dispatcher informed law enforcement officials that Cloaninger had threatened suicide. Id. at 328. In addition, one of the officers was aware that "Cloaninger had previously made suicide threats" and also believed that he "had firearms in the house." Id. at 332.

When officers arrived at Cloaninger's home to check on him, he refused to respond "to their concerns for his well-being." Id. The officers then called a VA hospital nurse, who confirmed that Cloaninger "had a history of threatening suicide." Id. The nurse also indicated that, under the circumstances, an emergency commitment order would be appropriate. Id. at 333. We held that "the initial VA call, coupled with knowledge of Cloaninger's prior suicide threats and the belief that he possessed firearms," constituted probable cause that Cloaninger was a danger to himself. Id. at 334.

While these cases outline the standard for probable cause in situations where law enforcement officials must decide whether to detain an individual on the belief that he might be a danger to himself, they provide less guidance here. Indeed, none of the cases delineates the appropriate standard where a mental health evaluator must decide whether to recommend a temporary detention on the belief that an individual might be a

17

danger to others. They certainly do not speak to the necessity, length, and substance of a psychological evaluation, nor to the evidence needed to support probable cause in such a circumstance.

Nonetheless, to the extent the cases should have informed Campbell's conduct, they support the view that he acted reasonably under our prevailing legal standards. Unlike in Bailey, Campbell's recommendation that Raub be detained was supported by far more than a 911 call. Rather, it was based on the initial observations of law enforcement officers, the content of Raub's Facebook posts, the information provided by Raub's former colleagues, and--later--on Campbell's own evaluation and observations of Raub. Indeed, the quantum of evidence here is greater than that in Cloaninger--where we found probable cause based only on an initial hospital call, a history of suicide reports, and a belief that Cloaninger possessed firearms--and is more like the circumstances in Gooden and S.P.--where officers based their seizure on both prior reports of distress and their personal observations of individuals at the scene.

In sum, we think it doubtful that Campbell violated Raub's Fourth Amendment rights based on our existing precedent. We need not, however, pass on that question because we hold that Campbell is entitled to qualified immunity on the ground that

18

the unlawfulness (if any) of his conduct was not clearly established at the time he recommended Raub's seizure.[7]   See Pearson, 555 U.S. at 241 (cautioning against deciding "questions of constitutionality . . . unless such adjudication is unavoidable") (internal quotation marks omitted); see also Buchanan v. Maine, 469 F.3d 158, 168 (1st Cir. 2006) (stating that avoiding the Fourth Amendment question in qualified immunity analysis is appropriate where the "inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts").[8]

---

[7] The report of Raub's psychological expert, Dr. Catherine Martin, does not change our conclusion.  Although Dr. Martin questions whether Campbell's probable cause determination was ultimately correct, we need not resolve that issue under this stage of our analysis.  Our inquiry here is "not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact," Hunter, 502 U.S. at 228 (1991), but whether Campbell's conduct was reasonable under then prevailing law.

[8] We also reject Raub's argument that Campbell is not entitled to qualified immunity because he negligently omitted from his petition for a temporary detention order the statement of Raub's mother, who told Campbell she had noticed no changes in Raub's behavior.  In the arrest context, a law enforcement officer's omission of material facts from a warrant affidavit deprives him of qualified immunity only if the omission was made intentionally or with a "reckless disregard for the truth." Miller v. Prince George's Cnty., Md., 475 F.3d 621, 627 (4th Cir. 2007) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).  Allegations of negligence or mistake are not enough. Id. at 627–28.  To the extent Raub contends Campbell intentionally or recklessly misled the magistrate judge, he failed to properly raise this issue below.  Thus, we decline to (Continued)

19

IV.

We turn next to Raub's contention that the district court erred in granting summary judgment on his First Amendment claim. Raub's argument is based on his allegation that Campbell recommended Raub be detained for an evaluation based on Raub's "unorthodox political statements." Appellant's Br. at 50. Under the first prong of the qualified immunity analysis, the district court concluded that Raub failed to advance facts sufficient to support a First Amendment claim, and we agree.

A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the "alleged retaliatory action adversely affected" his protected speech, and (3) a causal relationship between the protected speech and the retaliation. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685–86 (4th Cir. 2000). Of note, our causal requirement is "rigorous." Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). "[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the

consider it. See Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 242 (4th Cir. 2009).

20

[state actor] would not have taken the alleged retaliatory action." Id.

Raub's evidence falls far short of this requirement. Raub contends that Campbell recommended his detention based on his "political" statements concerning 9/11 conspiracies and impending revolution. Assuming these statements are indeed protected by the First Amendment, Raub ignores the numerous other facts on which Campbell's recommendation was based, including the nature of Raub's Facebook posts, both Campbell's and Paris's observations of Raub's demeanor, the information contained in Bullen's email about the recent increase in the seemingly threatening posts, and Bullen's belief that Raub should be taken seriously. Thus, even if Raub's protected speech contributed to Campbell's decision to recommend his detention, it was not dispositive.

As a result, we agree with the district court that Raub did not make out a First Amendment violation, and that Campbell is therefore entitled to qualified immunity.

V.

Finally, we reject Raub's claim for injunctive relief. As the district court noted, a finding of qualified immunity extends only to Campbell's liability for damages. See Harlow v. Fitzgerald, 457 U.S. 800, 819 n.34 (1982). Nevertheless, the

21

district court concluded that Raub did not meet the standard for injunctive relief because, among other reasons, he could not demonstrate the "immediate threat of future injury," required for the equitable remedy. Raub v. Campbell, 3 F. Supp. 3d 526, 540 (E.D. Va. 2014). We review a denial of injunctive relief for abuse of discretion. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985).

We agree with the district court that injunctive relief is not appropriate on this record. First, we have recognized that "federal injunctive relief is an extreme remedy." Simmons v. Poe, 47 F.3d 1370, 1382 (4th Cir. 1995). To obtain such an injunction, a plaintiff must show (1) irreparable injury, (2) remedies at law "are inadequate to compensate for that injury," (3) "the balance of hardships between the plaintiff and defendant" warrants a remedy, and (4) an injunction would not disserve the public interest. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010).

Where a § 1983 plaintiff also seeks injunctive relief, it will not be granted absent the plaintiff's showing that there is a "real or immediate threat that [he] will be wronged again . . . in a similar way." Simmons, 47 F.3d at 1382 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). Even assuming Raub could make out a violation of his constitutional rights, "past wrongs do not in themselves amount

22

to that real and immediate threat of injury." Simmons, 47 F.3d at 1382 (quoting Lyons, 461 U.S. at 103). Consequently, Raub's claim that he will in the future be subject to "unreasonable seizures and retaliation because of his political beliefs," Appellant's Br. at 58, is merely speculative, such that he cannot make out "this prerequisite of equitable relief." See Lyons, 461 U.S. at 111.

## VI.

For the reasons given, we affirm the district court's judgment.

AFFIRMED