**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1290**

Z.G., by and through his mother and next friend, C.G.; C.G., on behalf of herself; J.G., on behalf of himself,

Plaintiffs - Appellants,

v.

PAMLICO COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION; LISA JACKSON, Superintendent, in her official capacity; SHERIFF CHRIS DAVIS, Pamlico County Sheriff, in his official capacity as the chief administrator of the Pamlico County Sheriff's Department; DEPUTY BAILEY, in his Official Capacity,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. James C. Dever III, Chief District Judge. (4:15-cv-00183-D)

Argued: May 9, 2018                                   Decided: July 16, 2018

Before GREGORY, Chief Judge, and MOTZ and KEENAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Keenan wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

**ARGUED:** Stephon John Bowens, Saleisha Nadia Averhart, BOWENS & AVERHART LLC, Raleigh, North Carolina, for Appellants. Rachel B. Hitch, SCHWARTZ & SHAW, P.L.L.C., Raleigh, North Carolina; Christopher J. Geis, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Rachel P. Nicholas, SCHWARTZ & SHAW, P.L.L.C., Raleigh, North Carolina, for Appellees

Pamilico County Public Schools Board of Education and Lisa Jackson.

———————————

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

At the time this suit was filed, Z.G. was a six-year-old child diagnosed with numerous conditions affecting his behavior and academic performance, including Attention Deficit Hyperactivity Disorder[1] and Autism Spectrum Disorder.[2] Throughout Z.G.'s year in kindergarten in a North Carolina public school, Z.G.'s parents informed the school on multiple occasions of Z.G.'s suspected disabilities. However, the school failed to identify or evaluate Z.G.'s eligibility for special education services. After this year-long failure to provide Z.G. with appropriate accommodations, early during his first-grade year Z.G. began behaving erratically in the classroom and attempted to abscond from school on three separate occasions. The school called the Pamlico County Sheriff's Department (the Sheriff's department) and, at the school superintendent's request, a Sheriff's deputy transported Z.G. to a hospital in a patrol car without his parents' consent. At the hospital, Z.G. was committed and given medication involuntarily. He remained in the hospital for two days.

---

[1] Attention Deficit Hyperactivity Disorder is a brain disorder that manifests itself in an "ongoing pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development." *Attention Deficit Hyperactivity Disorder*, The National Institute of Mental Health, https://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd/index.shtml (last modified Mar. 2016).

[2] Autism Spectrum Disorder is a developmental disability that causes social, communication, and behavioral challenges. *Autism Spectrum Disorder Fact Sheet*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Autism-Spectrum-Disorder-Fact-Sheet (last modified Dec. 6, 2017).

Z.G.'s parents filed an amended complaint on their own behalf and on behalf of Z.G. (collectively, the plaintiffs), against the Pamlico County Public Schools Board of Education (the Board), the Sheriff's department, and Superintendent Lisa Jackson (Jackson) in her official capacity. Also named as defendants in the complaint were Pamlico County Sheriff Chris Davis (Davis) and an incorrectly identified Sheriff's deputy, each in his official capacity. The plaintiffs alleged that the defendants violated the Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and related federal statutes, as well as various provisions of North Carolina common law.

The district court dismissed the complaint in its entirety, concluding that the plaintiffs had failed to exhaust their administrative remedies with respect to the IDEA and other education-related claims, and that the plaintiffs' other unrelated federal allegations, including the challenge to Z.G.'s involuntary commitment, failed to state a claim. The court declined to exercise supplemental jurisdiction over the state law claims, and denied the plaintiffs' motion to amend their complaint a second time.[3] For the

---

[3] The district court also struck a surreply that the plaintiffs had filed, without leave of court, in opposition to the defendants' motion to dismiss. The plaintiffs challenge this decision, which we review for abuse of discretion. *See FDIC v. Cashion*, 720 F.3d 169, 176 (4th Cir. 2013). We conclude that this challenge is without merit, because the Federal Rules of Civil Procedure do not address the filing of a surreply, and a court ordinarily will not abuse its discretion in declining to consider such a filing particularly in the absence of any new evidence or argument in the reply brief. *See Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 548–49 (6th Cir. 2014). We also note that the local rules for the Eastern District of North Carolina provide only that replies to a response to a motion are disfavored, and make no mention of permitted surreplies. *See* E.D.N.C. Civ. R. 7.1(g). Indeed, the only references to surreplies in the local rules state that "[a] reply (Continued)

4

reasons that follow, we affirm in part, and vacate and remand in part, the district court's judgment.

## I.

In January 2015, Z.G. enrolled in kindergarten at Pamlico County Primary School (PCPS) after transferring mid-year from a public charter school that was "ill equipped to meet his special educational needs."[4]  PCPS was the only public non-charter elementary school in the district.  Upon Z.G.'s transfer, his father, plaintiff J.G., informed the school's principal, Ms. Potter,[5] that Z.G. had experienced disciplinary and educational problems at the charter school.  Potter advised J.G. that PCPS would help identify Z.G.'s educational needs under Section 504 of the Rehabilitation Act of 1973[6] (Section 504), but that Z.G.'s parents would be responsible for obtaining and paying for an evaluation of Z.G.  Potter also stated that while Z.G.'s evaluations were taking place, Z.G. would be

---

or surreply memorandum (where allowed)" shall not exceed a certain length.  *Id.* 7.2(f)(1).  Accordingly, the district court did not abuse its discretion in striking the plaintiffs' unauthorized surreply.

[4] Because we are reviewing the district court's grant of a Rule 12(b)(1) and Rule 12(b)(6) motion to dismiss, we recount the facts as alleged in the complaint.  *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991).

[5] The complaint does not identify Ms. Potter's first name.

[6] Pub. L. No. 93-112, 87 Stat. 355 (codified at 29 U.S.C. § 701 *et seq.*).

permitted to ride the "Exceptional Children's" bus, a school bus for students with special needs.

Z.G.'s mother, plaintiff C.G., submitted to PCPS a special education referral form for Z.G. On April 2, 2015, Julie Rowe, the psychologist retained by Z.G.'s parents to perform the evaluation of Z.G., sent PCPS her preliminary report. In her report, Rowe requested that the school provide Z.G. with a Section 504 Accommodation Plan (504 Plan), which is a plan detailing services under the Rehabilitation Act to be provided to a disabled student. *See* 29 U.S.C. § 794. Rowe's report also stated that Z.G. presented numerous symptoms, such as being "restless, inattentive, [and] anxious," that are "commonly seen in Aspergers[7] children." In light of her evaluation, Rowe recommended that Z.G. have access to a special room at school "to manage his outbursts," and access to alternative classroom placements if he became overstimulated in the regular classroom environment. Around this time, Z.G.'s classroom teacher submitted a "504 Teacher Referral Form," noting that although Z.G. was intelligent, he struggled with maintaining focus and completing assignments, and could be uncooperative, argumentative, and destructive, as well as "disrespectful to adults and children, [and] occasionally violent."

Despite these reports and recommendations, PCPS failed to hold any meeting to identify or evaluate Z.G. or to provide him with special education services while he was a

---

[7] Asperger syndrome is a developmental disorder on the autism spectrum characterized by impairment of language and communication skills and repetitive or restrictive patterns of thought and behavior. *Asperger Syndrome Information Page*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Asperger-Syndrome-Information-Page (last modified May 23, 2017).

kindergartner during the 2014-15 school year.  Instead, Z.G. spent "most school days" during his kindergarten year in the principal's office with Potter.

In July 2015, C.G. met with Crystal Dixon, the new principal of PCPS, and informed her of Z.G.'s educational and behavioral needs.  Dixon later advised C.G. that the school had no documentation showing Z.G.'s entitlement to ride the Exceptional Children's bus.

On August 24, 2015, the first day of Z.G.'s first-grade year, Dixon contacted C.G. to "pick up" Z.G. from school early.  Dixon told C.G. that Z.G. was "hysterical and screaming in the classroom," and eventually had fallen asleep on the floor of the principal's office.  The following day, Dixon again called C.G., instructing her to pick up Z.G. early.[8]  On August 26, Dixon and Z.G.'s classroom teacher once more requested that C.G. pick up Z.G. early.  When C.G. arrived at PCPS, Dixon, Jackson, and another school official also were present with Z.G. in the principal's office.  The officials told C.G. that on August 24, 25, and 26, Z.G. had run into the school parking lot in an attempt to leave school in order "to harm himself," and that Dixon had placed Z.G. in "therapeutic holds" when Z.G. attempted to escape.  C.G. also learned that PCPS had failed to prepare a 504 Plan for Z.G.

---

[8] The complaint does not specify the reason for the early pick-up request on August 25.

Jackson offered to drive C.G. and Z.G. to the hospital, but C.G. declined. A Pamlico County Sheriff's deputy, later correctly identified as Deputy Blayney,[9] arrived to transport Z.G. to the hospital. The plaintiffs alleged that without C.G.'s consent, the deputy forced Z.G. into the rear of the patrol car and transported him to a nearby medical center.

At the hospital, Z.G. was committed involuntarily, and was held at the hospital for two days without his parents' consent. On August 27, a Craven County Sheriff's Department deputy transported Z.G. to another hospital for further evaluation. Medical personnel at that hospital diagnosed Z.G. with autism and informed C.G. that involuntary commitment was unnecessary. After Z.G. was discharged from the hospital, J.G. submitted another referral form to PCPS requesting special education services for Z.G.

In September 2015, PCPS personnel held a meeting to prepare for Z.G. both a 504 Plan and an Individualized Education Program (IEP).[10] The Plan included accommodations such as support from a teacher's assistant, exemption from testing protocols, and the option of going to a "[s]ensory [c]hoice [r]oom" for decreased stimulation. PCPS personnel also required that a new risk assessment of Z.G. be completed before he would be permitted to return to school. C.G. and J.G. complied with

---

[9] The complaint does not identify Deputy Blayney's first name.

[10] The IEP is a written statement of the educational program designed to meet a disabled child's individual needs that is developed, reviewed, and revised in accordance with state and federal laws. *See generally A Guide to the Individualized Education Program*, U.S. Department of Education, https://www2.ed.gov/parents/needs/speced/iepguide/index.html (last modified Mar. 23, 2007).

this request and submitted a psychiatric report, which had been prepared at their expense and indicated that Z.G. presented "little risk to himself or others."

Contrary to the findings in the psychiatric report and the terms of the 504 Plan requiring that Z.G. receive a number of different services and accommodations, Z.G. was excluded from certain school activities and continued to exhibit erratic behavior. He eventually was suspended after threatening to slap Dixon and allegedly throwing a wooden stick at a teacher's assistant. Upon his return to school and for the remainder of his time at PCPS,[11] Z.G. was "warehoused in the [sensory choice room] all day without interaction with other students."

On September 26, 2015, the plaintiffs filed a petition with the North Carolina Office of Administrative Hearings, alleging that Z.G. was denied a "free appropriate public education." Several weeks later, on November 10, 2015, C.G. noticed bruising on Z.G.'s body. In response to C.G.'s questions, Z.G. said that "Mr. Greene [the PCPS behavior specialist] had hurt [him] recently." C.G. took Z.G. to a pediatrician, who identified the bruising as being consistent with abusive action.

The plaintiffs filed a notice of voluntary dismissal of their petition without prejudice on November 17, 2015. The same day, the plaintiffs filed this action in federal court. The plaintiffs later amended their complaint, alleging 12 separate counts. Counts 1 through 3 alleged violations of the IDEA, the Rehabilitation Act, and the Americans

---

[11] Z.G. is no longer enrolled at PCPS, although it is unclear from the record when Z.G. left the school permanently.

with Disabilities Act[12] (ADA) (the education-related claims). Count 4 alleged retaliation against the plaintiffs for conduct protected under the ADA and the Rehabilitation Act. Count 5 alleged that the defendants deprived Z.G. of his constitutional rights in violation of 42 U.S.C. § 1983. Counts 6 through 10 asserted various claims under North Carolina law related to Z.G.'s involuntary commitment, and alleged battery by Greene and Dixon. Counts 11 and 12 sought injunctive relief under the IDEA.

After the defendants filed a motion to dismiss, the plaintiffs sought to amend their complaint a second time. The district court dismissed the complaint in its entirety, holding that: (1) the plaintiffs had failed to exhaust their administrative remedies with respect to the IDEA and other education-related claims; and (2) the non-education allegations, including the challenge to Z.G.'s involuntary commitment, failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court also declined to exercise supplemental jurisdiction over the state law claims. The district court denied the plaintiffs' motion to amend, concluding that any amendment would be futile. The plaintiffs now appeal.

## II.

The plaintiffs' education-related claims under the IDEA, the Rehabilitation Act, and the ADA generally alleged that the Board and Jackson failed (1) to provide Z.G. with a free appropriate public education in the least restrictive environment, (2) to develop a

---

[12] Pub. L. 110-325, 122 Stat. 3554 (codified at 42 U.S.C. §§ 12101-12213 (2006)).

proper IEP, (3) to provide substantively appropriate instruction, and (4) to evaluate and address properly Z.G.'s disabilities. The plaintiffs also claimed that the defendants retaliated against them for exercising their statutory rights.

The defendants argue that the district court properly dismissed these education-related claims, because they were subject to the IDEA's exhaustion requirement with which the plaintiffs failed to comply. The plaintiffs, however, contend that they were not required to exhaust their administrative remedies, because such efforts would have been futile. We agree with the defendants.

A.

Before we address the defendants' jurisdictional challenge to the plaintiffs' education-related claims, we begin by stating the legal principles governing this appeal. The IDEA was enacted to safeguard the right of all children with disabilities to receive a "free appropriate public education" (FAPE). 20 U.S.C. § 1412(a)(1)(A). To comply with the IDEA, a school district must provide to students with disabilities "meaningful access to the educational process" in the least restrictive environment that allows a disabled student to participate in activities alongside non-disabled children. *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 526 (4th Cir. 2002); 20 U.S.C. § 1412(a)(5)(A).

To resolve disputes concerning a student's right to a FAPE, the IDEA establishes a formal set of procedures that grant a plaintiff the right to file a civil action in federal court. *See* 20 U.S.C. § 1415(f), (g). Prior to bringing suit, however, a plaintiff must exhaust his administrative remedies. *See id.* § 1415(l). The plaintiff begins by filing a

11

complaint with the local or state education agency regarding any matter concerning the child's education, as permitted under state law. *See id.* § 1415(b)(6). The filing of such a complaint creates a right to a preliminary meeting with school system officials. *Id.* § 1415(f)(1)(B)(i). If the grievance is not resolved at that meeting, the plaintiff may request a due process hearing in accordance with specific procedures established by the state. *Id.* § 1415(f)(1)(A).

In North Carolina, the administrative review process encompasses two steps. First, the plaintiff must file with the Office of Administrative Hearings a petition for an "impartial hearing" before an administrative law judge (ALJ). *See* N.C. Gen. Stat. § 115C-109.6(a), (f). Second, the plaintiff may appeal the decision of the ALJ to a Review Officer appointed by the State Board of Education. *Id.* § 115C-109.9(a). The plaintiff has exhausted administrative remedies under 20 U.S.C. § 1415(l) when he receives a finding or a decision from the Review Officer. *See* 20 U.S.C. § 1415(i)(2); *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 513–15 (4th Cir. 2014). Only after receiving the Review Officer's finding or decision may a plaintiff proceed to file a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A); *E.L. ex rel. Lorsson*, 773 F.3d at 513–15.

We have recognized only three "narrow exceptions" to this exhaustion requirement. *MM ex rel. DM*, 303 F.3d at 536. These exceptions are "(1) when [resort to] the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative

12

exhaustion would have worked severe harm upon a disabled child." *Id.* Absent one of these exceptions, this Court lacks jurisdiction over a plaintiff's IDEA claims. *Id.*

B.

With these principles in mind, we turn to consider whether we have jurisdiction over the plaintiffs' education-related claims. We initially observe that, here, the plaintiffs neither alleged that they completed the administrative review process, nor that they obtained any decision following a hearing or from a Review Officer. Rather, the plaintiffs argue that they were not required to exhaust their administrative remedies, because to do so would have been futile.[13] According to the plaintiffs, an ALJ is not authorized under North Carolina law to issue injunctive relief protecting a student from physical harm by school officials. Thus, because they seek such relief to preclude various defendants from continuing to use certain methods of restraint on Z.G., the plaintiffs claim that they cannot "obtain adequate relief through the administrative process." We disagree.

The plaintiffs' IDEA claim challenges the defendants' methods of responding to manifestations of Z.G.'s disabilities, and the defendants' failure to provide Z.G. with the necessary services and modifications to assure that he received instruction tailored to his

---

[13] On appeal, the plaintiffs assert for the first time that they satisfied the two other exceptions to exhaustion, namely, that they did not receive proper notice of their administrative rights, and that exhaustion would have resulted in severe harm to Z.G. *See MM ex rel. DM*, 303 F.3d at 536. We will not consider an issue that could have been raised in the district court but was not. Therefore, because the plaintiffs failed to preserve these arguments before the district court, we will not consider them here. *Makdessi v. Fields*, 789 F.3d 126, 131 (4th Cir. 2015).

13

unique developmental and educational needs. The IDEA grants state administrative law judges broad authority to require a school to implement services and modifications designed to address "behavior violation[s]" that are manifestations of a disability. *See* 20 U.S.C. §§ 1415(k)(1)(D), 1415(b)(6), 1415(f). Accordingly, an ALJ is empowered under the IDEA to redress the plaintiffs' alleged injuries.[14] *See generally* 20 U.S.C. § 1415(f)(3)(E)(i) (requiring a hearing officer's decision be made "on substantive grounds based on a determination of whether the child received a [FAPE]").

Moreover, North Carolina law authorizes ALJs to order prospective relief regarding issues relating to a child's education, including placement and provision of services. State law permits a plaintiff to seek a due process hearing "with respect to *any matter* relating to the identification, evaluation, or educational placement of a child, or the provision of a free appropriate public education of a child, or a manifestation determination." N.C. Gen. Stat. § 115C-109.6(a) (emphasis added); *see also id.* § 115C-109.8 (describing the circumstances under which a hearing officer may find a procedural violation of the IDEA, including a "deprivation of educational benefits" resulting from the violation). The State Board of Education also is vested with the authority to order a

---

[14] We note that the fact that the plaintiffs also seek damages does not free them from the obligation to exhaust administrative remedies. *See, e.g.*, *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 276–77 (3d Cir. 2014) (noting that while compensatory and punitive damages are not available remedies under the IDEA, a monetary award "may nevertheless be granted as reimbursement for certain expenses incurred"); *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 916 (6th Cir. 2000) ("We disagree that the plaintiff's damages claim alone excuses her from exhausting her administrative remedies [under the IDEA].").

school district to "provide a child with appropriate education," to place the child in a private school in order to provide that education, and to reimburse parents for private school expenses. *Id.* § 115C-109.9(c). Under these broad provisions, state agencies may order prospective relief to ensure that a child receives a FAPE. Thus, the futility exception to the exhaustion requirement does not excuse the plaintiffs' failure to exhaust their IDEA claim.[15]

## C.

The plaintiffs similarly argue that their claims under Section 504 of the Rehabilitation Act, the ADA, and the anti-retaliation provisions of both statutes were not subject to the IDEA's exhaustion requirement under the futility exception. We again disagree.

Claims brought under other federal laws protecting the rights of children with disabilities, such as the Rehabilitation Act and the ADA, also are subject to the IDEA's

---

[15] Although Z.G. is no longer enrolled in PCPS, the plaintiffs' suit is not moot. In their amended complaint, the plaintiffs seek a wide range of remedies, including reimbursement for Z.G.'s educational expenses. Thus, the amended complaint presents a live controversy. *See, e.g.*, *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 89 (2d Cir. 2005) (observing that several circuits have held that "a claim for compensatory education or reimbursement can defeat a mootness challenge in an IEP placement dispute"); *Me. Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 18 (1st Cir. 2003) (concluding that "[t]he presence of an actionable claim for compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends"); *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 774–75 (8th Cir. 2001) (holding that the plaintiff's compensatory education claim was not moot because the claim related to the school district's past IDEA violations and sought compensatory remedies); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 890 (9th Cir. 1995) (determining that because the plaintiffs' claim was for tuition reimbursement, the claim presented a live controversy).

exhaustion requirement if those claims "seek relief that is also available under" the IDEA, namely, relief for the denial of a FAPE. 20 U.S.C. § 1415(l). To determine whether a suit "seeks" relief for the denial of a FAPE we "look to the substance, or gravamen, of the plaintiff's complaint." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 752 (2017).

The Supreme Court in *Fry v. Napoleon Community Schools* has directed courts to consider two hypothetical questions to decide whether the gravamen of a plaintiff's complaint is the denial of a FAPE. *Id.* at 756. We first ask whether the plaintiff could "have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school." *Id.* Next, we determine whether "an *adult* at the school . . . [could] have pressed essentially the same grievance[.]" *Id.* If we answer both these questions in the affirmative, the complaint does not challenge the denial of a FAPE. *Id.* However, if the answer to both questions is "no," then a plaintiff likely seeks relief for the denial of a FAPE, such that the exhaustion requirement applies. *Id.*

The Supreme Court further explained in *Fry* that the history of the proceedings may help identify the gravamen of a plaintiff's complaint. *Id.* at 757. A plaintiff who first invokes the IDEA's formal administrative procedures but later "shift[s] to judicial proceedings prior to full exhaustion" often provides "strong evidence" that the denial of a FAPE is the substance of the plaintiff's complaint. *Id.*

Applying the *Fry* framework to the plaintiffs' Rehabilitation Act and ADA claims, we conclude that the crux of these claims is an effort to alter Z.G.'s educational placement, secure certain educational services, and ensure the plaintiffs' procedural rights

16

guaranteed by the IDEA. In other words, the plaintiffs challenge the adequacy of Z.G.'s educational experience while enrolled in the school district. These claims would not be brought against a non-school facility, such as a public theater or a library. *See id.* Nor would an adult, on his own behalf, bring such claims against the defendants. *See id.* Additionally, the fact that the plaintiffs filed a petition requesting a due process hearing under the IDEA, which challenged the same conduct alleged in the present complaint, is further evidence that the gravamen of the present complaint is the denial of a FAPE.

Likewise, the plaintiffs' claim under the anti-retaliation provisions of the ADA and the Rehabilitation Act also is subject to the exhaustion requirement. 20 U.S.C. § 1415(l). The plaintiffs' allegations underlying this claim "relate unmistakably" to the provision of a FAPE to Z.G. *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000). For example, Z.G.'s parents contend that the defendants retaliated against them due to their efforts "to enforce their statutory rights for their minor, public school going child." In particular, the parents alleged that the defendants "[c]onstantly" called them to pick Z.G. up early from school, prohibited Z.G. from sitting with his siblings on the Exceptional Children's bus, and refused to allow Z.G. to participate in field trips and other school-sponsored events.

These factual allegations demonstrate that the plaintiffs' retaliation claim arises directly from the parents' advocacy for Z.G.'s educational rights. Thus, the retaliation claim is grounded on the school's failure to provide a FAPE, and the plaintiffs were required to exhaust the IDEA's administrative process before bringing that claim. *See Batchelor*, 759 F.3d at 274–75 (holding that the "plain language of the IDEA required

17

exhaustion" of retaliation claims because of the "logical path" between those claims and the defendants' failure to provide a FAPE to the student); *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1158–59 (11th Cir. 2006) (holding that retaliation claims "clearly relate[d]" to student's evaluation and education and were subject to the exhaustion requirement); *Rose*, 214 F.3d at 210 (holding that retaliation claims were related to the evaluation and educational placement of a student and, thus, had to be exhausted).

Accordingly, we conclude that the plaintiffs' claims under the Rehabilitation Act and the ADA, as well as under the anti-retaliation provisions of both statutes, also were subject to the requirement of administrative exhaustion.[16] Having already determined that exhausting these remedies would not have been futile, we affirm the district court's dismissal of these counts for failure to exhaust the administrative remedies required by the IDEA.

III.

We turn to address the plaintiffs' remaining federal claims, which seek relief separate from the IDEA and the other federal statutes discussed above. In particular, we

---

[16] The plaintiffs' request for an injunction in Count 11 seeks to enjoin the defendants from using physical restraints or from placing Z.G. in the sensory choice room for more than 15 minutes at a time. Again, this claim seeks a change in Z.G.'s educational accommodations, which at its core alleges a denial of a FAPE. Thus, the plaintiffs also were required to exhaust this claim under Section 1415(l).

18

consider (1) the plaintiffs' claim under Section 1983 for deprivation of liberty[17] based on the transport of Z.G. to a hospital and his involuntary commitment, and (2) the plaintiffs' request for an injunction to limit the manner in which the defendants may serve the parents with documents of any kind. Because these claims seek relief separate from the IDEA, the claims are not subject to the IDEA's exhaustion requirement. Therefore, we turn to consider whether these claims survive the defendants' Rule 12(b)(6) motion.

## A.

We first consider the claims brought against the individual defendants in their official capacities. The plaintiffs brought both the Section 1983 claim and the requests for injunctive relief against (1) the Board, (2) Jackson, the superintendent, in her official capacity, (3) the Sheriff's department, (4) Sheriff Davis, in his official capacity, and (5) the incorrectly identified Sheriff's deputy, in his official capacity. Because a claim against a public official in his official capacity is "essentially a claim against" the governmental entity that the official represents, the district court correctly dismissed as duplicative the claims against the individual defendants in their official capacities. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004). Thus, we turn to determine

---

[17] The plaintiffs' Section 1983 claim primarily challenges the school's use of the sensory choice room and its involuntary commitment of Z.G. To the extent that these allegations relate to the school's placement of Z.G. in the sensory choice room, this claim is intertwined with the relief sought under the IDEA and must comport with the exhaustion requirement. However, the portion of this claim that challenges Z.G.'s transportation to a hospital and involuntary commitment is not related to Z.G.'s educational rights under the IDEA. Our discussion in this section relates only to the latter portion of the Section 1983 claim.

19

whether the plaintiffs' allegations are sufficient to state a claim against the governmental entities at issue, namely, the Sheriff's department and the Board.

B.

The plaintiffs' Section 1983 claim alleged a deprivation of Z.G.'s liberty based on the defendants' actions leading to Z.G.'s involuntary commitment. To hold a governmental entity liable for a constitutional violation under Section 1983, a plaintiff must show that "an unconstitutional custom or usage, i.e., a widespread practice of a particular unconstitutional method," was the cause of a constitutional violation. *Randall v. Prince George's Cty.*, 302 F.3d 188, 210 (4th Cir. 2002) (internal quotation marks and citation omitted). The "custom or usage" also must be traceable to a municipal policymaker. *Id.* A plaintiff can satisfy the "custom or usage" requirement for municipal liability in one of four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citations, internal quotation marks, and brackets omitted).

Although the plaintiffs emphasize the egregiousness of the challenged conduct, their complaint is devoid of any allegation of a widespread policy or custom of the Board or the Sheriff's department that authorized the defendant employees to transport Z.G. to obtain his involuntary commitment. Indeed, the plaintiffs' complaint fails even to mention the existence of any such policy or custom. Further, the plaintiffs have not

20

alleged, either in their complaint or on appeal, that any of the individual defendants acted as policymakers with respect to the challenged actions at issue. Accordingly, because the plaintiffs failed to allege a constitutional violation against the governmental entities under Section 1983, we affirm the district court's dismissal of this claim under Rule 12(b)(6).

## C.

Likewise, the plaintiffs have failed to state a facially sufficient claim for injunctive relief based on their allegation that the defendants "harassed" the plaintiffs by serving documents on them.[18] A plaintiff seeking a permanent injunction must show "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Raub v. Campbell*, 785 F.3d 876, 885–86 (4th Cir. 2015). Here, however, the plaintiffs have not alleged any cognizable harm that would be caused by in-person delivery of the documents. Therefore, we affirm the district court's dismissal of this claim.

## IV.

---

[18] Although the complaint does not specify whether the plaintiffs request a preliminary or permanent injunction, the plaintiffs' briefing to this Court indicates that they seek a permanent injunction.

The plaintiffs next argue that the district court erred in denying their motion for leave to file a second amended complaint on the ground that the amendment would be futile. The plaintiffs' motion sought (1) to correct the name of the Sheriff's deputy who transported Z.G. to the hospital, and (2) to add Jackson, Davis, and Deputy Blayney, the corrected name of the Sheriff's deputy, as defendants in their individual capacities.[19] Although we affirm in large part the denial of the motion to amend, we agree with the plaintiffs that the amendment to add a Section 1983 claim against Jackson individually would not have been futile.[20]

We review the denial of a motion to amend a pleading for abuse of discretion. *Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010). Before filing a second amended complaint, a plaintiff must obtain the consent of the opposing party or leave of court, and the district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). We have applied this rule liberally in favor of amendment and

---

[19] Specifically, in the proposed second amended complaint, the plaintiffs asserted claims against Jackson in her individual capacity in Counts 2, 3, 4 through 9, 11, and 12. The plaintiffs also asserted claims against Davis and Blayney in their individual capacities in Counts 5, 11, and 12.

[20] Aside from these two changes, the proposed second amended complaint does not add any new claims or additional factual allegations to the existing claims. Therefore, with the exception noted above concerning Jackson, our decision to affirm the district court's dismissal of the plaintiffs' various federal claims either for failure to exhaust administrative remedies or for failure to state a claim apply with equal force to the proposed second amended complaint. Furthermore, adding individual capacity claims for retaliation under the ADA and Section 504 would be futile, because neither statute permits an action against individual defendants. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (discussing the ADA); *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) (discussing Section 504 of the Rehabilitation Act).

22

have held that courts should deny leave to amend only if amendment would be prejudicial to the opposing party, if the plaintiff acted in bad faith, or if the amendment would be futile. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

Here, the plaintiffs have alleged that the defendants deprived Z.G. of his "personal liberty" in violation of the Fourteenth Amendment, a substantive due process claim brought under Section 1983. Substantive due process protects individuals from "arbitrary" government action that constitutes "egregious official conduct." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Only executive conduct that "shocks the conscience" can support a cognizable substantive due process claim. *Id.* at 846. Generally, the challenged executive action "must have been 'intended to injure in some way unjustifiable by any government interest.'" *Waybright v. Frederick Cty.*, 528 F.3d 199, 205 (4th Cir. 2008) (quoting *Cty. of Sacramento*, 523 U.S. at 849).

We conclude that the proposed claims against Blayney and Davis in their individual capacities would be futile, because those claims plainly do not meet the high standard of pleading necessary to state a substantive due process claim. According to the plaintiffs' own allegations, Blayney was informed that Z.G. had attempted to flee from school and harm himself, and that school officials had used a "therapeutic hold" on Z.G. to restrain him. Blayney later was directed to transport Z.G. to a hospital. Neither Blayney's execution of this directive nor his delivery of documents to the plaintiffs "offend[ed] due process" by "shock[ing] the conscience." *Cty. of Sacramento*, 523 U.S. at 846 (discussing the standard applicable to claims of an abuse of executive power by a governmental entity). Similarly, amending the complaint to include an individual

23

capacity claim against Davis would be futile, because the complaint as amended fails to allege that Davis was involved personally in any of the relevant incidents. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

We conclude, however, that the plaintiffs were entitled to amend their complaint to include a claim against Jackson, the superintendent, in her individual capacity. We begin by noting that we express no opinion on the merits of this claim against Jackson or her entitlement to qualified immunity. Rather, we hold only that the plaintiffs have met the established liberal standard for obtaining leave to amend their complaint. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that courts must "heed[]" the mandate that leave to amend shall be freely given); *see also Wade Elecs. Serv., Inc. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir. 1987).

According to the plaintiffs' allegations, Jackson ordered the forced transportation of Z.G., a six-year-old first-grade student, by law enforcement for the purpose of obtaining his involuntary commitment when his parent objected and Z.G. did not pose a risk at the time he was transported. And Jackson allegedly did so knowing of Z.G.'s various disabilities and their related manifestations. Although the standard for a due process violation is rigorous, these allegations against Jackson, if proved, are sufficiently egregious that they fairly may be said to violate the "decencies of civilized conduct."[21]

---

[21] Although "negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Cty. of Sacramento*, 523 U.S. at 849, Jackson's conduct as alleged by the plaintiffs may rise above mere negligence, given that a parent was present, Z.G. posed no risk, and the situation had deescalated. Accordingly, at this stage of the (Continued)

24

*See Rochin v. California*, 342 U.S. 165, 173 (1952). Therefore, the proposed amendment adding a due process claim against Jackson in her individual capacity is not "clearly . . . futile because of substantive . . . considerations." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980). The district court, in the first instance, will be required to conduct an "exact analysis of [the] circumstances" in this case and ultimately determine the merits of this claim. *Cty. of Sacramento*, 523 U.S. at 850.

Additionally, "absence of prejudice, though not alone determinative, will normally warrant granting leave to amend." *Piper Aircraft Corp.*, 615 F.2d at 613. And, here, the defendants do not claim that they would be prejudiced by allowing the plaintiffs to amend their complaint. Thus, we do not discern any reason for denying to the plaintiffs what district courts otherwise freely give. Accordingly, we vacate the portion of the district court's order denying the plaintiffs leave to file a second amended complaint against Jackson in her individual capacity on the Section 1983 claim.[22]

V.

litigation, it is not obvious that the plaintiffs' Section 1983 claim against Jackson in her individual capacity would be futile.

[22] We emphasize that our reversal of the district court's judgment is limited. The plaintiffs are entitled only to amend their complaint (1) to add a Section 1983 claim against Jackson in her individual capacity for her conduct in ordering Z.G.'s transportation to the hospital for the purpose of seeking his involuntary commitment, and (2) to reassert their state law claims for the district court to consider whether to exercise supplemental jurisdiction over those claims.

For these reasons, we affirm the district court's dismissal of Counts 1 through 4 based on the plaintiffs' failure to exhaust their administrative remedies. To the extent that the plaintiffs' Section 1983 claim in Count 5 challenges Z.G.'s placement in the sensory choice room, we also affirm for failure to exhaust. To the extent that Count 5 challenges Z.G.'s involuntary commitment, we affirm the dismissal for failure to state a claim against the Board, Sheriff's department, and the individual defendants in their official capacities. Additionally, we affirm the dismissal of the plaintiffs' claims for injunctive relief in Counts 11 and 12 for failure to exhaust and failure to state a claim, respectively. We also affirm the court's striking of the plaintiffs' unauthorized surreply.

With respect to amending the complaint, we vacate the district court's order denying the plaintiffs leave to amend to add a claim under Section 1983 against Jackson in her individual capacity, based on her conduct in ordering the transportation of Z.G. for the purpose of having Z.G. involuntarily committed. We otherwise affirm the district court's denial of the plaintiffs' motion for leave to amend. On remand, the court also should consider again whether to exercise supplemental jurisdiction over the plaintiffs' state law claims in Counts 6 through 10.

*AFFIRMED IN PART;*
*VACATED IN PART;*
*AND REMANDED*

26